# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
VICTOR WARE et al.,
Defendants and Appellants.

S263923

Fourth Appellate District, Division One
D072515

San Diego County Superior Court
SCD255884

---

December 1, 2022

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Groban, Jenkins, and Guerrero concurred.

---

PEOPLE v. WARE

S263923


Opinion of the Court by Kruger, J.


Defendant Nicholas Hoskins was charged with and convicted of conspiracy to commit murder, for which he was sentenced to 25 years to life. The charged conspiracy consisted of a two-year-long agreement among at least 20 gang members to kill members of rival gangs, without agreement as to any specific times, persons, or places where killing would take place. There was no evidence that Hoskins had committed or participated in any act of violence. The prosecution instead sought to tie Hoskins to the charged conspiracy primarily through evidence of his gang membership, access to weapons, and social media posts celebrating violence against rival gangs. Hoskins argues this evidence is insufficient to support a conviction for conspiracy to commit murder. Reviewing the entire record in light of established principles of conspiracy law, we agree. We reverse the judgment of the Court of Appeal and remand for further proceedings.

**I.**

**A.**

In the early 2010's, a violent conflict broke out among criminal street gangs in the San Diego area. The conflict was sparked by the April 2011 killing of Dereck Peppers, who was a member of the 5/9 Brim criminal street gang, a set of the Bloods gang. In response to the killing, the Brim gang declared war on

1

rival Crips gangs, leading to a spike in gang-related shootings that resulted in multiple injuries and deaths.

Hoskins was a member of the 5/9 Brim gang. The prosecution charged him, along with fellow gang members Dionte Simpson and Victor Ware, with multiple offenses stemming from the events of the early 2010's. Among other things, the prosecution alleged that all three were participants in a conspiracy spanning a roughly two-year period between January 1, 2012, and April 23, 2014, and involving at least 20 Brim members in total. The prosecution alleged the object of this conspiracy was the murder of rival gang members.

At trial, the prosecution presented evidence that both Simpson and Ware had either committed or aided and abetted shootings aimed at rival gang members. By contrast, the prosecution presented no evidence that Hoskins either committed or aided and abetted any act of violence. Nor did the prosecution present direct evidence that Hoskins agreed with others to commit violent acts. To establish Hoskins's participation in the charged conspiracy, the prosecution instead relied on four categories of circumstantial evidence: (1) evidence of Hoskins's gang membership; (2) evidence that Hoskins had access to a gun on at least one occasion during the conspiracy; (3) evidence of Hoskins's involvement in the events surrounding the August 27, 2013, shooting of Byreese Taylor; and (4) evidence of Hoskins's social media posts celebrating violence against rival gangs. Because this case concerns a challenge to the sufficiency of the evidence against Hoskins, we will describe each category of evidence in some detail.

*1. Evidence of gang membership.* The prosecution presented extensive evidence establishing Hoskins's

membership in both the 5/9 Brim and a subset of the gang known as the "Hit Squad." This evidence included a photograph showing a large "B" tattooed on Hoskins's chest, as well as photographs from Hoskins's phone and social media accounts in which he or other gang members made Brim or "Crip killing" gang signs and wore red clothing associated with the gang. In addition, Hoskins was a member of the Southside Brim Gang Facebook group. In his social media posts, he used unusual spelling and terminology common among Brim members, replacing the letter "C" with either a "K" or "Ck" (for "Crip killer" or "Crip killing") or "B" (for "Blood"), and occasionally signing off his posts with "5/9" (for the 5/9 Brim). One of his nicknames was "Bick Nick." The prosecution also introduced a photograph showing another one of Hoskins's nicknames written on the wall of a house belonging to an alleged coconspirator, alongside the nicknames of other Brim and Hit Squad members. Finally, a witness familiar with the defendants testified that Hoskins was part of the Hit Squad, also known at various times as the "Young Hit Squad" and the "Tiny Hit Squad." According to the witness, this subset of the Brims had more "shooters" and "K's," meaning "kills," than another subset, the "Hound Unit."

*2. Access to firearms.* The prosecution presented evidence that in February 2012, Hoskins was riding in a car that was pulled over for a faulty license plate light. Hoskins and the two other people in the car — both alleged 5/9 Brim members — were eventually searched, and Hoskins was found with a loaded firearm concealed in a sock tucked into his pants. Hoskins was arrested with a fellow Brim member. While the two were in the patrol car, Hoskins told the other Brim member that he would take responsibility for the gun and other contraband found in

the car. There was no evidence linking the gun to any prior shootings.

The prosecution also presented evidence that in August 2012, Hoskins and an unidentified male were questioned by police officers based on a suspected curfew violation. (In fact, Hoskins was 19 years old at the time, so the curfew did not apply.) Hoskins was questioned in front of the driveway of a house on Florence Street and initially gave the police a false name. At some point, the unidentified male who was with Hoskins walked to the backyard of that house. Officers later recovered a loaded revolver from the backyard. They had not seen Hoskins enter the backyard, nor was there any evidence that Hoskins knew about the gun.

*3. Shooting of Byreese Taylor.* On August 27, 2013, Taylor was walking in West Coast Crips (WCC) territory when he was shot by a passenger riding in the front seat of a car. The passenger, who was wearing a red cloth over his face, was not identified; the driver of the car was Timothy Hurst, a 5/9 Brim member. According to the prosecution's gang expert, the shooting appeared to be a mistake: Taylor was not a rival gang member, but a member of a gang allied with the Brims. Hurst was later arrested for and convicted of the shooting.

The evidence showed Hoskins was a longtime friend of Hurst's. Their grandmothers were neighbors, and the two men had grown up together and remained close friends. After Hurst was arrested, officers searched his car and found a mixture of DNA on the passenger side of the vehicle from at least four individuals, including Hoskins's as "a possible major contributor to that mixture." The prosecution expert could not, however, determine when the DNA had entered the van or whether it had

arrived through direct contact or was transferred from another object.

To link Hoskins to the Taylor shooting, the prosecution introduced several photographs of Hoskins and his alleged coconspirators that were taken in the vicinity of the shooting. This included a photograph, uploaded to Hoskins's Facebook account on February 21, 2013 — about six months before the Taylor shooting — showing Hurst "tossing up 5/9 Brim and Crip killer" signs. The prosecution noted that the photograph was taken at a known WCC hangout about a mile from where Taylor was shot and argued that the photograph demonstrated the two were "laying the groundwork" for the Taylor shooting. The prosecution also introduced two photographs — posted on Instagram by another Brim member, Edward Paris, on the morning of August 27, 2013 — showing Hoskins and Paris standing in the same park, throwing up gang signs, and appearing to give the middle finger to WCC. The photographs were taken about seven hours before Taylor was shot and one mile away from the location of the shooting.

The prosecution also introduced Facebook messages that Hoskins sent after the shooting to Taylor and Hurst's girlfriend, in which Hoskins discussed the case against Hurst and tried to dissuade Taylor from testifying so that Hurst could "beat his [c]ase." Hoskins threatened to reveal that Taylor was "snitching" to the police, but ultimately did not carry out this threat.

About six months after the shooting, Hoskins posted on Facebook: "I switch up on bitcKh [n-words] fast I Love my Bros But I'm truer to the Kode sHit I'd turn on TB if he did some gay

sHit and vise versa nuttin personal #onBrims."[1] "TB" referred to Hurst, who was also known as "Tim Brim." According to the prosecution's gang expert, Hoskins meant that he "love[d] his gang," but was "truer to the code, the code being no snitching." The expert suggested Hoskins meant to call out Hurst for talking to the police about the circumstances of the shooting.

4. *Social media posts.* Hoskins was active on social media, and the prosecution introduced extensive evidence of his social media posts and photographs, as well as photographs of Hoskins uploaded to other 5/9 Brim members' accounts, to demonstrate Hoskins's awareness and approval of the violent rivalry against Crips. The prosecution argued that Hoskins's social media activity provided a "window" into his mind: his posts were "his words," gave the jury "an idea of the mindsight of Mr. Hoskins," and reflected a desire to "tell[] the world on Facebook" that he was serious about his "Crip killing." The prosecution also argued that Hoskins used social media to disrespect rival gang members. He was Facebook "friends" with at least two rival gang members, one of whom was a victim in a shooting allegedly committed by a Brim member, indicating that at least some rival gang members could view his Facebook posts. Though some of Hoskins's status updates could be seen and commented on by nonfriends, it was otherwise unclear which of his posts were publicly accessible and which were visible only to his Facebook friends.

---

[1] Throughout this opinion, we quote the relevant communications as they appeared in Hoskins's original social media posts, including his spelling and capitalization. But consistent with the approach taken in the Court of Appeal and by the parties, we use the term "n-word" rather than the original that appeared in the posts.

Some of the posts were close in time or location to gang-related shootings, which the prosecution offered as proof that Hoskins was "encouraging, promoting, and furthering the violence." For example, in April 2012, several days after a rival Crips gang member was shot, Hoskins posted on Facebook that "cKrossys" — referring to the Crips — "got Hit, all I need is some Dro and my day is set."[2] Two 5/9 Brim members were later prosecuted for the shooting and convicted. In February 2013, Hoskins posted a photograph of Hurst standing at a recognizable street intersection, near the site of a January 2012 shooting in WCC gang territory that was linked to the Brims. The prosecution suggested Hoskins posted the photograph to "brag about" the 2012 shooting.

Other posts seemingly taunted rivals. In February 2013, Hoskins posted a photograph of himself in a well-known WCC park with the caption, "cKome Out nd play! We out Here! Earth is my turf & dats #OnMyTurf!" In his opening statement, the prosecutor emphasized that "[i]n the world of gangs, respect is paramount," and that going into rival gang territory and "post[ing] it for everyone to see" is "incredibly disrespectful." In March 2014, WCC member Paris Hill was murdered. The 5/9 Brims were not suspected to be involved in Hill's death. A few days later, Hoskins posted on Facebook: "That's some gay sHit not Gansta yall getBacK taggin in the set? That's all yo DeadHomie worth? That's why I kall yall cKraBs." The prosecution argued that Hoskins knew some WCC members would see his message and was mocking them for their response

---

[2] The full Facebook post read: "Son was Born healthy. cKrossys got Hit, all I need is some Dro and my day is set lol #Happy Easter!"

to Hill's death, calling them a derogatory term for Crips members, "crabs." Hoskins also posted that message hours after WCC gang member Carlton Blue had been shot; the Brims were suspected to be involved in Blue's shooting. The prosecution also introduced various online exchanges, including messages between Hoskins and a rival WCC member taunting each other about a brief encounter on the street.

Finally, the prosecution introduced a number of Hoskins's Facebook posts in which he celebrated violence against rival gangs and described his life as a gang member. In one post, Hoskins wrote that he was "tired of grindin, fighting, runnin, jail, death, stress, betrayal and everything else this game has to offer but it's what we signed up for right?" On other occasions, he wrote, "Never BacK Down is the MuthafucKin motto!" and "Violence may Be the easy thing to do But I like easy, it makes sense! #9s!," with "#9s" referring to the 5/9 Brims. In a separate post, Hoskins wrote in part, "Bl59ds kill rips & rips kill Bl59ds [n-words] . . . these are all things we already know so why do we trip? Started with a cKhoicKe," which the prosecution's gang expert translated in part to, "Bloods kill Crips. Crips kill Bloods." Hoskins also explained what it meant to be an "OG or older homie/general," writing that gaining such an elevated status "isn't established by age or how long you been around I mean it Kount But u need the stripes and reputation to matcKh. Bighomie lol." According to the prosecution's gang expert, this meant that building one's status and reputation within the gang required putting in the "work," which could involve "some type of mission," such as a burglary, robbery, or shooting. To prove that Hoskins had acquired an elevated status, the prosecution introduced Facebook evidence of Hoskins identifying himself as "Big Bick Nick" and of a fellow Brim member identifying himself

as "Little Bick Nick"; according to the prosecution's expert, it was a sign of respect for a younger member to take an older member's name, and this usually indicated that the older member was "working towards OG status."

The prosecution also called attention to several of Hoskins's Facebook posts, including: (1) a February 2013 photograph of Hoskins making the Crip killer hand sign with the caption, "Spell it BicK NicK tell he really Bout his cK's," with "cK's" meaning "Crip killing," (2) a May 2014 photograph of Hoskins wearing a red bandana around his face, with the caption, "Rags around our facKe to Beat the Kase inKase a [n-word] look 5/9 BrimGang," accompanied by several terms related to the rival WCC and Neighborhood Crips (NC) gangs, and (3) a May 2014 status update, "Ganstas don't flicK it with gigs they use em," which the prosecution gang expert translated as, "Real gangsters don't take pictures with their guns. They use them." The prosecution also introduced a March 2014 post from Hoskins: "My okkupation Steal,Kill,&Deal everything gotta prise even your life." The prosecution's gang expert explained this meant that Hoskins saw his job as to "steal, kill, and deal," and that, as part of his work, he would "put a value on anything," "even your life." The prosecution's gang expert also acknowledged, however, that not every 5/9 Brim member who displayed "Ck" on social media killed Crips; that some members might "do it strictly on social media," meaning only post about Crip killing without actually doing so; and that not all Brim members commit crimes.

## B.

The jury found Hoskins and his codefendants guilty of conspiracy to commit murder, in addition to other offenses.

Hoskins was also convicted of participation in a criminal street gang conspiracy, in violation of Penal Code section 182.5, while his two codefendants were convicted of various offenses including attempted murder. As to all three defendants, the jury found the conspiracy was for the benefit of a criminal street gang. (Pen. Code, § 186.22, subd. (b)(1).) Hoskins was sentenced to 25 years to life in prison. (*Id.*, §§ 182, subd. (a) [conspiracy], 187, subd. (a) [murder].)

On appeal, Hoskins challenged the sufficiency of the evidence supporting his convictions. The Court of Appeal reversed the gang conspiracy conviction for lack of evidence establishing a particular element of that offense.[3] But the court rejected Hoskins's challenge to his murder conspiracy conviction, finding sufficient evidence that Hoskins and his alleged coconspirators "came to a mutual understanding to murder rival NC and WCC gang members and that [Hoskins] participated in the conspiracy." (*Ware*, *supra*, 52 Cal.App.5th at p. 939.) Though the court acknowledged that "the prosecution failed to prove that [Hoskins] was a direct participant or aider and abettor in any of the shootings," it found sufficient evidence from which a jury could conclude Hoskins knew about the conspiracy and had the requisite intent to join it and facilitate the object offense. (*Id.* at p. 941.)

The Court of Appeal identified several pieces of evidence in support of its conclusion. First, the court pointed to Hoskins's

---

[3] Specifically, the court concluded there was no evidence Hoskins had promoted, furthered, assisted, or benefited from " '*any felonious criminal conduct*' " by 5/9 Brim members, as opposed to conduct not constituting a felony. (*People v. Ware* (2020) 52 Cal.App.5th 919, 951 (*Ware*).) The court's ruling on Hoskins's gang conspiracy conviction is not before us.

social media posts about "Crip killing," including photographs of Hoskins "tossing the gang sign for Tiny Hit Squad" and " 'CK' "; his nickname of " 'Bick Nick' "; and his Facebook posts that he was "really about his Crip killing" and his " 'occupation' " was to " 'steal, kill, and deal.' " (*Ware*, *supra*, 52 Cal.App.5th at pp. 941–942.)

The court next pointed to evidence concerning Hoskins's proximity to firearms, including his prior arrest with a concealed gun and one-time proximity to a loaded revolver,[4] as well as his Facebook post that, according to an expert, meant "gangsters do not take photographs with guns, they use them." (*Ware*, *supra*, 52 Cal.App.5th at p. 942.) From this evidence, the court concluded, a jury could infer "Hoskins carried firearms and had the intent to use them." (*Ibid*.)

The Court of Appeal also pointed to certain Facebook posts that seemed to celebrate violence against Crips members and were made close in time to two shootings allegedly part of the conspiracy. The court held a jury could reasonably infer that Hoskins's April 2012 post about a Crips member getting shot — "cKrossys got Hit" — was about the shooting of a rival gang member just days earlier. (*Ware*, *supra*, 52 Cal.App.5th at p. 942.) A jury could also reasonably infer that Hoskins knew about the August 27, 2013, Taylor shooting in advance because of the photograph, taken hours before the shooting, showing

---

[4]     The Court of Appeal stated that the loaded revolver was recovered "in an area after chasing Hoskins." (*Ware*, *supra*, 52 Cal.App.5th at p. 942.) This appears to be an error; the record does not show Hoskins was chased, and the loaded revolver was found in the backyard of a house of which Hoskins was standing in front. The apparent misstatement of the evidence does not, however, affect our analysis of the issue presented.

Hoskins and a fellow 5/9 Brim member " 'flipping off' " a rival gang about one mile away from where Taylor was later shot.[5] (*Ibid.*)

Finally, the Court of Appeal concluded that because of "Hoskins's relationship to the coconspirators," a reasonable jury could combine evidence of Hoskins's social media activity and proximity to firearms with his alleged coconspirators' conduct to infer that Hoskins "knew of the conspiracy and had the deliberate, knowing, and specific intent to join" it. (*Ware, supra,* 52 Cal.App.5th at p. 942.) According to the court, this conclusion was bolstered by the jury's finding of gang enhancements against all defendants, which "necessarily" meant the jury "found the evidence of interdependence among the participants in the crimes to be persuasive." (*Ibid.*)

The Court of Appeal's opinion was initially unpublished. After filing, the Attorney General requested partial publication.[6] The Attorney General argued that the conspiracy portion of the opinion merited publication because it "applies an existing rule of law to a set of facts significantly different from those stated in published opinions." Specifically, the opinion "upholds the conspiracy to commit murder convictions . . . based

---

[5] The Court of Appeal wrote that Hoskins and Paris were " 'flipping off' NC," but the evidence suggests they were trying to insult WCC, a different rival Crips gang, instead. (*Ware, supra,* 52 Cal.App.5th at p. 942.) Again, the apparent misstatement is not material to our analysis of the issue presented.

[6] In a separate letter, the San Diego District Attorney's Office sought, and the Court of Appeal granted, publication of the portion of the opinion discussing the withdrawal of Hoskins's attorney.

on the broad context of forming an agreement amongst the gang members to kill rival gang members, without any agreement as to specific time, person or place that any killing would take place." (Citing Cal. Rules of Court, rule 8.1105(c)(2), (3).)[7] Because there were no published opinions upholding a conspiracy like the one charged here, publication would "assist prosecutors in prosecuting gang members for conspiracy to commit murder based on forming a tacit general agreement to kill rival gang members." The Court of Appeal granted the partial publication request.

We granted Hoskins's petition for review to address the nature of the evidence necessary to establish participation in the charged murder conspiracy.

## II.

Conspiracy " 'is an inchoate offense, the essence of which is an agreement to commit an unlawful act.' " (*People v. Johnson* (2013) 57 Cal.4th 250, 258 (*Johnson*).) This crime has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator. (Pen. Code, § 182, subd. (a)(1); see, e.g., *People v. Morante* (1999) 20 Cal.4th 403, 416.)

The first element, concerning the existence of an agreement, "is the crux of criminal conspiracy." (*People v.*

---

[7] The Attorney General also sought, and the Court of Appeal granted, publication of the opinion section discussing First Amendment challenges to the use of social media evidence at trial.

*Homick* (2012) 55 Cal.4th 816, 870.) As the Attorney General acknowledged in his publication request, this case is unusual in that the alleged object of the conspiracy is nonspecific: The charged conspiracy instead arises in "the broad context of forming an agreement amongst the gang members to kill rival gang members, without any agreement as to specific time, person or place that any killing would take place."

In this appeal, Hoskins does not dispute that the prosecution has adequately proved the first element of conspiracy, the existence of an agreement. Nor does he challenge the adequacy of the prosecution's showing as to the final element, an overt act in furtherance of the conspiracy. To satisfy this particular element, a jury need only find that any member of the conspiracy committed a single overt act, whether criminal or not. (*People v. Russo* (2001) 25 Cal.4th 1124, 1135; accord, *People v. Smith* (2014) 60 Cal.4th 603, 616.) Here, one of Hoskins's codefendants was convicted at trial of an attempted murder in furtherance of the conspiracy. Even if the prosecution had presented no evidence of any other overt act, the attempted murder conviction of an alleged coconspirator in furtherance of the conspiracy is sufficient to show the overt act element has been satisfied.

Hoskins's challenge instead focuses on the nature of the evidence necessary to connect any individual gang member to a nonspecific, long-running conspiracy of the sort alleged here. More specifically, he contests the prosecution's showing regarding the two mental elements of conspiracy, which are the elements that establish an alleged conspirator's participation in, and liability for, the charged unlawful agreement.

## A.

The mental state elements of conspiracy require the prosecution to demonstrate the defendant had the specific intent both to agree to the conspiracy and to commit the object offense. (*People v. Horn* (1974) 12 Cal.3d 290, 296; *People v. Jurado* (2006) 38 Cal.4th 72, 123.) The two elements are distinct, but closely related. In some cases, it may be useful to distinguish between the two elements, especially when evidence of one is direct and the other is circumstantial. (See, e.g., *People v. Marsh* (1962) 58 Cal.2d 732, 742–744 [focusing on intent to commit a crime where there was clear evidence of intent to agree]; *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 629 [focusing on intent to agree where there was clear evidence of intent to commit a crime].) But in many cases, proof of the two specific intent elements will overlap. (See, e.g., Harno, *Intent in Criminal Conspiracy* (1941) 89 U.Pa. L.Rev. 624, 631 ["[The two types of intent necessary for conspiracy] always shade into each other and often there is no practical purpose served in distinguishing them"].) Together, these two specific intent elements play a critical role in a conspiracy prosecution: Proof of these elements is what separates a coconspirator from a mere bystander to the crime.

Here, where we consider these elements in the context of a charged conspiracy stemming from a gang rivalry, the proof necessary to differentiate a coconspirator from a bystander takes on particular significance. Decades ago, in *Scales v. United States* (1961) 367 U.S. 203, the United States Supreme Court held that the First Amendment forbids punishing a person merely for associating with others — even as part of a group premised on a violent aim. Because the law will not recognize a rule of guilt by association, we insist on proof of a

defendant's knowledge of, and specific intent to further, the group's unlawful ends. (*Scales*, at p. 229; see, e.g., *Elfbrandt v. Russell* (1966) 384 U.S. 11, 19 ["A law which applies to membership without the 'specific intent' to further the illegal aims of the organization . . . rests on the doctrine of 'guilt by association[,]' which has no place here"]; *Holder v. Humanitarian Law Project* (2010) 561 U.S. 1, 18 [noting that "mere membership" in, or association with, an organization that advocates terrorism cannot itself be criminalized].)

This basic principle is reflected in California's extensive statutory regime targeting gang activity, as well as in judicial decisions interpreting and applying that law. (Pen. Code, § 186.20 et seq.; see, e.g., *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*).) California statutes impose substantial criminal penalties — ranging from additional terms of years to indeterminate life terms of imprisonment — on gang members who commit crimes in concert with other members, or for the benefit of the gang, with the specific intent to promote, further, or assist criminal activity. (Pen. Code, § 182.5 [offense of gang conspiracy]; *id.*, § 186.22, subds. (a) [offense of active gang participation], (b)(1) [sentence enhancements for gang-related felonies], (b)(4) [alternative penalties for certain gang-related felonies].) In enacting the law, the Legislature deliberately "sought to avoid punishing mere gang membership." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1134 (*Rodriguez*).) Thus, under the gang statutes, "[m]ere active and knowing participation in a criminal street gang is not a crime." (*Id.* at p. 1130; see *People v. Mesa* (2012) 54 Cal.4th 191, 196; *People v. Albillar* (2010) 51 Cal.4th 47, 57–58; *People v. Castenada* (2000) 23 Cal.4th 743, 747–752; *People v. Loeun* (1997) 17 Cal.4th 1, 11.) For all the same reasons, in a traditional conspiracy

prosecution broadly targeting gang rivalry, our review of the evidence must take care to distinguish between mere evidence of gang membership, on the one hand, and participation in the charged conspiracy, on the other.

Caution is likewise warranted because of the unusual nature of the charged conspiracy in this case. The type and volume of evidence necessary to establish the existence of a broad, nonspecific gang-related conspiracy of the sort alleged here poses challenges to a factfinder attempting to distinguish the guilt of one defendant from that of another. In any conspiracy prosecution, "the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of [the] existence of the conspiracy itself." (*Krulewitch v. United States* (1949) 336 U.S. 440, 453 (conc. opn. of Jackson, J.).) This feature of conspiracy prosecutions raises particular concerns in the context of a prosecution involving a "single massive conspiracy . . . . [¶] . . . The risk is that a jury will be so overwhelmed with evidence of wrongdoing . . . that it will fail to differentiate among particular defendants." (*U.S. v. Evans* (10th Cir. 1992) 970 F.2d 663, 674.) The risk of confusion makes it particularly critical for courts to carefully distinguish between evidence of mere membership in a gang embroiled in a violent rivalry and evidence sufficient to support a conviction for conspiracy to commit murder.

Several well-established principles of conspiracy law guide us in this task. To establish the requisite specific intent connecting an individual defendant to the charged conspiracy, the prosecution must show that the defendant intended to play some part in achieving the conspirator's unlawful ends. Put differently, "[t]here must be something more than '[m]ere

17

knowledge, approval of or acquiescence in the object or the purpose of the conspiracy.' " (*U.S. v. Cianchetti* (2d Cir. 1963) 315 F.2d 584, 588, quoting *Cleaver v. U.S.* (10th Cir. 1956) 238 F.2d 766, 771; see *Michael R. v. Jeffrey B.* (1984) 158 Cal.App.3d 1059, 1069; see also *Direct Sales Co. v. U.S.* (1943) 319 U.S. 703, 711 [knowledge of a conspiracy is necessary, but not sufficient, to show that a person "intends to further, promote and cooperate in it"].)  A cheerleader, no matter how enthusiastic, is not a coconspirator unless the prosecution can prove the cheering was intended to play some role in achieving the object offense. Likewise, a member of a group may receive some benefit from others' misdeeds, but without more, a mere beneficiary is not a coconspirator.  Unlike a Penal Code section 182.5 gang conspiracy charge, in which knowingly benefiting from the conspiracy is a basis for liability, a Penal Code section 182 traditional conspiracy requires the prosecution to demonstrate that the individual defendant intended to play a role in the object offense, not merely profit from it after the fact.  (See *Johnson, supra,* 57 Cal.4th at p. 262.)

While it may be useful to show the precise role the defendant intended to play in achieving the object of the conspiracy, the prosecution is not required to establish precisely how the defendant intended to achieve the ends of the conspiracy or that the defendant's chosen means were effective in achieving those ends.  Nor, certainly, must the prosecution establish the intent to participate in every act necessary to complete the object offense.  (See *Salinas v. United States* (1997) 522 U.S. 52, 63 ["A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense"].)  But ultimately, to connect any individual to the charged conspiracy, the prosecution must at least

establish that the individual specifically intended to agree to commit the criminal offense and to play at least some role in achieving it. (See *id.* at pp. 63–64.)

**B.**

With these settled principles in mind, we turn to Hoskins's evidentiary challenge for his murder conspiracy conviction. Although murder liability is divided into different degrees and can rest on different theories (see Pen. Code, §§ 187, 189), conspiracy to commit murder can only take a single form: It "requires a finding of unlawful intent to kill, i.e., express malice" (*People v. Cortez* (1998) 18 Cal.4th 1223, 1228) and "is necessarily conspiracy to commit premeditated and deliberated first degree murder" (*id.* at p. 1237). The question before us, then, is whether sufficient evidence supports the finding that Hoskins had the specific intent to agree to kill and the specific intent to commit killings, whether personally or by playing a role in killings carried out by others.

To answer the question, we must " 'review the entire record in the light most favorable to the judgment,' " and then determine whether it contains " 'evidence that is reasonable, credible, and of solid value' " such that a reasonable jury could have found the defendant guilty beyond a reasonable doubt. (*Renteria, supra,* 13 Cal.5th at p. 970; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) As we have recently explained, "sufficiency determinations necessarily take account of the 'standard of proof that applied before the trial court.' " (*Renteria,* at p. 970, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008.) "[T]hat is why in criminal cases we must ensure the record

demonstrates substantial evidence to establish guilt beyond a reasonable doubt." (*Renteria*, at p. 970.)

We must " 'presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence . . . "for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87, quoting *People v. Zamudio* (2008) 43 Cal.4th 327, 357, citation omitted.) But we cannot, however, venture beyond the evidence presented at trial, and may consider only those inferences that are reasonably supported by the record. " '[A] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360, quoting *People v. Morris* (1988) 46 Cal.3d 1, 21.) It "must logically flow from other facts established in the action," and it cannot be "based entirely on the suspicions of the officers involved in the case and the conjecture of the prosecution." (*People v. Austin* (1994) 23 Cal.App.4th 1596, 1604.)

Here, the evidence showed that Hoskins (1) was an active member of the 5/9 Brim gang; (2) had access to guns at some point during the charged conspiracy; (3) tried to help Hurst after Hurst's arrest for the August 27, 2013, Byreese Taylor shooting; and (4) knew of and voiced his support on social media for violence against rival gang members. Considering the evidence as a whole, we conclude that no reasonable jury could have found beyond a reasonable doubt that Hoskins had the requisite intent to participate in a conspiracy to commit murder. Though we discuss each category of evidence in turn, we stress that our

conclusion is based on our assessment of the evidence in its entirety.

We begin with the evidence of Hoskins's ties to the 5/9 Brim gang and alleged participants in the charged conspiracy. The evidence showed that Hoskins was a member of the Southside Brim Gang Facebook group, friends on Facebook with Brim gang members, and regularly communicated with Brim members and affiliates. Hoskins consistently affirmed his affiliation with the 5/9 Brim gang and professed his support for the gang online, and the jury saw numerous photos of Hoskins displaying Brim gang signs and associating with fellow Brim members, including alleged coconspirators, as well as posts describing his life in a gang. The evidence amply supports the allegation that Hoskins was an active Brim member during the alleged conspiracy, and Hoskins does not dispute this allegation. It is, however, a separate question whether Hoskins was a member of the charged conspiracy.

"[C]ommon gang membership may be part of circumstantial evidence supporting the inference of a conspiracy." (*People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20; see *People v. Frausto* (1982) 135 Cal.App.3d 129, 140–141 [describing instances where proof of gang membership tended to demonstrate motive for a crime or participation in a conspiracy]; *U.S. v. Garcia* (9th Cir. 1998) 151 F.3d 1243, 1247 ["[W]hen evidence establishes that a particular gang has a specific illegal objective . . . evidence of gang membership may help to link gang members to that objective"].) But proof of common membership alone is not sufficient to establish participation in a criminal conspiracy. (See *Rodriguez*, *supra*, 55 Cal.4th at p. 1134.) The effect of such a rule would be to criminalize mere association with gang members, which the

law forbids. (See *ibid.*; *Quinteros*, at p. 20 ["[M]ere association does not prove a criminal conspiracy"]; cf. *U.S. v. Herrera-Gonzalez* (9th Cir. 2001) 263 F.3d 1092, 1095 [stating that it is "not a crime to be acquainted with criminals"].)

The Attorney General contends that Hoskins was "not just a gang member — he was a part of the gang's subset responsible for killing rival and perceived rival gang members," the Hit Squad. The Attorney General suggests that a reasonable jury could have inferred that such membership reflects an intent to join the conspiracy and to commit murder. We are not persuaded. First, contrary to the Attorney General's characterization, the record does not show that the Hit Squad was a "kill squad" whose "mission was to kill Crips." The Attorney General points to trial evidence that many Hit Squad members committed crimes and that Tiny Hit Squad had more shooters and "k's" than Hound Unit. But just because one group has more shooters and "kills" than another does not establish that only shooters and killers were allowed in the first group, or that its very purpose was to kill. One police officer, called to testify about his investigation into a shooting undertaken by 5/9 Brim members not on trial, did refer in passing to Tiny Hit Squad as "essentially [an] assassination crew within the 5/9 Brim gang." But the officer offered no evidentiary support for that assertion, the Attorney General does not discuss this evidence on appeal, and the record supplies no support on its own. Without more evidence about the internal workings of the Hit Squad or its requirements for membership, evidence that Hoskins was part of the Hit Squad — like evidence that he was part of the 5/9 Brim gang in general — shows only that Hoskins associated with people involved in various violent criminal

activities, and not that he held any specific intent to join them in those activities.

Second, and relatedly, the Attorney General identifies no evidence that Hit Squad members needed to follow any specific set of rules or norms, or have any special qualifications or undergo any particular initiation rite (such as committing a particular crime), as a condition of membership. Though evidence of rules and norms can be relevant in assessing an individual's participation in a charged conspiracy (see *U.S. v. Bingham* (9th Cir. 2011) 653 F.3d 983, 998 [describing strict gang rules enforced via formalized hierarchy]; *People v. Kopp* (2019) 38 Cal.App.5th 47, 75 [describing gang's rules about cooperating with law enforcement]), there was no evidence of that sort here. The limited evidence on this subject at trial instead showed that many members of the Hit Squad were relatives, and suggested that the Hit Squad "subset" was, at least in part, a generational grouping within the gang. Nor was there evidence tending to show that the choice to become a 5/9 Brim gang member in general was necessarily also a choice to participate in a long-running, nonspecific conspiracy to commit murder. It is undisputed that the 5/9 Brim gang had an active and violent rivalry with the WCC and NC gangs during the period of the alleged conspiracy. It is also undisputed that Brim members, like gang members generally, were expected to support the goals of the gang, including by backing each other up in fights. But a "general agreement, implicit or explicit, to support one another in gang fights does not provide substantial proof of the specific agreement required for a conviction of conspiracy to commit assault," much less conspiracy to commit murder. (*U.S. v. Garcia, supra*, 151 F.3d at p. 1244.) Again, without more specific evidence about the requirements of Hit

Squad or Brim membership, we conclude that no reasonable jury could have inferred that membership entailed an agreement by all of its members, including Hoskins, to kill rivals.

The Attorney General repeatedly describes Hoskins as not merely a member of the gang, but an "active leader." Again, the record does not support this characterization. The only indication Hoskins had achieved some elevated rank was evidence that another 5/9 Brim member had adopted Hoskins's gang moniker as his own; that member went by "Little Bick Nick," a reference to Hoskins's nickname, "Bick Nick." This evidence, however, does not reasonably support an inference of Hoskins's leadership or "high-level" status within the Brims. Indeed, the prosecution's gang expert testified only that this indicated Hoskins was "working towards" a more senior position in the gang — not that he had necessarily achieved it. And even setting aside the minimal evidence regarding Hoskins's purportedly elevated status, it is unclear what significance the jury reasonably could ascribe to such status. The prosecution's gang expert testified that gang members must carry out "missions" to gain respect — and presumably to advance in the group — but the testimony appeared to be based on an impression of gangs generally, rather than the specific practice of the 5/9 Brims. In any event, the evidence did not show what sort of mission would be necessary to achieve whatever status Hoskins might have obtained within the gang. To the extent the prosecution might have sought to rely on an inference that a leader or person with elevated status must have been involved in gang decisionmaking, including the critical decision to murder unspecified members of rival gangs over an extended period of time, that inference is likewise unsupported by the

evidence. The prosecution's gang expert testified that the 5/9 Brims did not have a fixed internal hierarchy, but rather only a "loose" structure. Even if Hoskins were considered a "high-level" member of the gang or enjoyed some type of elevated status, the record shed little light on what decisionmaking responsibilities might accompany that status — much less on the critical question of whether a "high-level" member was expected to join in any tacit agreement to kill rivals.

The next category of evidence relates to Hoskins's access and proximity to guns during the period of the alleged conspiracy. The Attorney General highlights two pieces of evidence: Hoskins's February 2012 arrest with a gun concealed in a sock tucked into his pants, and his August 2012 encounter with police when a loaded revolver was found nearby. As Hoskins points out, neither gun was ever linked to any shooting. Nor was there any indication that Hoskins intended to use either weapon at the time he was arrested — let alone that he even knew about the revolver found after his August 2012 encounter with police. Nonetheless, the Attorney General argues that this evidence indicates Hoskins was "ready and able to kill": that he "either was, or could easily be armed, if the opportunity to shoot rival Crip gang members arose." The evidence does not reasonably support such an inference. Though it may be reasonable to infer that Hoskins "could easily be armed" if the opportunity arose, it is not reasonable to infer that Hoskins therefore intended to commit first degree murder. Individuals — gang members included — frequently possess guns without harboring any intent to use the guns to commit premeditated, deliberate killings. Again, nothing in the record links Hoskins's possession or proximity to the guns described above to any shootings or any broader criminal design to murder

rivals. Without more, no reasonable jury could find that such evidence proved, beyond a reasonable doubt, that Hoskins intended to agree to participate in a conspiracy to murder rival gang members.

We turn, then, to the evidence concerning the August 27, 2013, shooting of Byreese Taylor. The Attorney General argues this evidence offers a concrete demonstration of Hoskins's intent to play a part in the shooting of perceived rivals. But here again, the record does not support this conclusion: The prosecution presented no substantial evidence from which a reasonable jury could find that Hoskins intended to play any part in the shooting of Byreese Taylor.

There was no substantial evidence that Hoskins was a direct participant in the shooting. The evidence showed only that Hoskins and Hurst — who was arrested for and convicted of the Taylor shooting — were longtime friends, and that Hoskins had been in the passenger seat of Hurst's vehicle at some unspecified point in the past. The Court of Appeal in this case reasoned, and the Attorney General now argues, that a jury could have reasonably inferred Hoskins's specific intent based on a photograph, taken on the morning of the shooting and posted later that day, showing Hoskins and another 5/9 Brim member standing in WCC territory and making gang signs. (*Ware, supra*, 52 Cal.App.5th at p. 942.) The Court of Appeal considered it reasonable to infer from the photograph that Hoskins "knew of the shooting set to occur that evening." (*Ibid.*) The Attorney General, for his part, argues the photograph is probative of Hoskins's intent because it was meant to lure victims for the upcoming shooting. As the Attorney General interprets the photograph, Hoskins and his alleged coconspirator were trying to show that they were "not afraid to

go into their rival gang members' territory" and "call[] out to rival Crips to come defend their territory and give the Hit Squad members an opportunity to shoot them."

The photograph in question could not reasonably have supported such an inference. It was taken seven hours before the shooting and in a location more than a mile away. Nothing about the photograph tends to establish that Hoskins or his alleged coconspirator was aware of the shooting in advance. And the Attorney General's argument about the probative value of the photograph is highly speculative, requiring a number of inferential leaps — starting from the gang expert's acknowledgement that "disrespect often require[s] retaliation" to an alleged plot to lure rivals, using social media, to a place where they would be murdered — to reach the conclusion that the photograph was part of a conspiracy to murder rivals by leading them into an ambush. The prosecution's gang expert did not testify, based on his experience and expertise, that a photograph of this sort might play the role of bait. As a result, the jury would have had no substantial basis to conclude the photograph was intended to lure rival gang members to a location where they would be killed.

Even if the prosecution had shown that posting the photograph constituted more than mere posturing, and was instead calculated to provoke a prompt in-person response, the prosecution also failed to introduce evidence sufficient to demonstrate beyond a reasonable doubt that the photograph was intended to lead to a deadly ambush, as opposed to any other form of confrontation. Nor does the theory seem plausible in light of the evidence of how the Taylor shooting in fact occurred. The evidence shows that on August 27, 2013, 5/9 Brim members were not waiting to ambush rival gang members after

luring them to a location where they would be murdered. Instead, Hurst and others drove into a different part of rival territory searching for someone to shoot, and when no one clearly announced themselves as a rival (let alone sought to defend their territory), they accidentally shot a nonrival. The fact that no rival gang member was actually lured into a fight to defend the gang's territory on August 27 tends to undermine the Attorney General's argument that any such inference could reasonably be drawn from the photograph. And indeed, despite the considerable volume of evidence introduced at trial about the activities of Brim members over the two-year period of the charged conspiracy, the prosecution identifies no other instance where Brims employed such a strategy.

The evidence of Hoskins's role after the August 27 shooting does not alter this conclusion. While Hoskins engaged in extensive online conversations with others about the shooting and Hurst's arrest, none of those conversations indicated Hoskins knew of the shooting before it happened or played any role in the actual event. To be sure, the evidence showed that Hoskins collaborated with Hurst's girlfriend to pressure Taylor not to testify against Hurst, and his messages to Taylor were full of implicit threats. But as a whole, the conversation demonstrates only that Hoskins was worried about his childhood friend and was planning to share paperwork suggesting that Taylor was "snitching." The prosecution never presented evidence that Hoskins or Hurst's girlfriend entered into an agreement to kill Taylor. The Attorney General suggests that the alleged witness intimidation is relevant because it "showed that Hoskins was trying to get his coconspirator Hurst out of custody and back on the streets where he could continue his role in the ongoing conspiracy." It would be reasonable for

the jury to infer the truth of the first part of that sentence: that Hoskins was trying to help his childhood friend leave custody. But the inference that Hoskins's efforts were in furtherance of a conspiracy to commit murder rests on mere speculation. There is no evidence that Hoskins so much as discussed his efforts with other gang members. And certainly nothing in Hoskins's conversations concerning the shooting suggested the goal was to return Hurst to the streets specifically so he could murder rival gang members.

We now turn to the final category of evidence presented against Hoskins: his social media posts. The posts offer ample evidence that Hoskins knew and approved of the alleged conspiracy's goals. For example, in February 2013, Hoskins posted a photograph of himself making the "Crip killer" hand sign with the caption: "Spell it BicK NicK tell he really Bout his cK's." In January 2014, he posted: "Never BacK Down is the MuthafucKin motto!" And in May 2014, he posted: "Ganstas don't flicK it with gigs they use em." There was also evidence that Hoskins knew of and celebrated some shootings soon after they happened. For example, in April 2012, Hoskins posted: "Son was Born healthy. cKrossys got Hit, all I need is some Dro and my day is set lol #HappyEaster!" At trial, the prosecution's gang expert reasonably suggested that this post referred to a shooting, committed by 5/9 Brim members, of a rival Crips member — the "cKrossy[]" — several days earlier. In another instance, Hoskins taunted a rival gang after one of their own was shot, writing in March 2014: "That's some gay sHit not Gansta yall getBacK taggin in the set? That's all yo DeadHomie worth? That's why I kall yall cKraBs."

The Attorney General argues that Hoskins intended to encourage the war by "glorifying and endorsing" the violence on

social media. The posts do demonstrate that Hoskins approved of the violence, and perhaps even perceived some reputational benefit to himself from the gang's success in its ongoing conflict with rivals. But as we have noted, absent proof of intent to play some role in achieving the conspiracy's unlawful goals, neither being a cheerleader nor passively accepting the benefits of others' unlawful activities constitutes participation in a conspiracy. And the Attorney General fails to point to evidence showing that Hoskins intended the posts to facilitate murder. There is no evidence in any of Hoskins's posts of a plan to participate in any of the shootings that constituted the object of the conspiracy, nor is there evidence that such posts were directed to any alleged coconspirators (or that, as a whole, his Facebook posts were consistently viewable by those outside of his Facebook friend network).

The prosecution had asserted at trial that Hoskins's social media posts were particularly probative of his intent to participate in the conspiracy because Hoskins's posts celebrating gang violence provided a revealing "window" into his mind. As we consider the evidence on appeal, however, some caution is in order. Social media is not a bedside diary; it is a platform for expression aimed at a particular audience. (See, e.g., *Packingham v. North Carolina* (2017) 582 U.S. __ [137 S.Ct. 1730, 1737] ["Social media allows users to gain access to information and communicate with one another about it on any subject that might come to mind"].) Like any other form of public expression, social media posting may include an element of performance. (*Ibid.* [analogizing social media websites to the "modern public square," capable of "allow[ing] a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox' "].) At the

same time, social media statements, like any other statement, may reflect the speaker's state of mind, depending on their content and context. Whether a statement actually reflects the speaker's views or simply involves an element of performance or bravado are, of course, questions of fact for a jury to decide.

Here, in any event, the question is not simply whether Hoskins approved of the violence of others, but whether his statements, taken with the other evidence as a whole, were sufficient to show he intended to conspire with others to commit murder. On this score, the evidence falls short. Indeed, as the prosecution's own gang expert acknowledged, there could be 5/9 Brim members who "strictly" display "Ck" or post about "Crip killing" on social media without ever actually killing Crips. Hoskins's general celebration of gang violence on social media — with no evidence that he ever intended to play a role in committing any act of violence — is not enough to establish his participation in a conspiracy to commit murder.

In sum, after considering the record in its entirety, we conclude that the evidence presented at trial is insufficient to show that Hoskins had the requisite intent to participate in a conspiracy to kill rival gang members. The evidence showed that Hoskins was an active member of a gang whose other members committed acts of violence, that he celebrated those acts of violence, and that he had access to weapons that he could use in furtherance of those acts, if he so chose. The evidence unquestionably establishes Hoskins's membership in a group with violent aims and his association with individuals who commit violent crimes. But it is not sufficient to support a finding that Hoskins specifically intended to enter an agreement to commit murder, or that he specifically intended to commit murder, either personally or through others.

In reaching a contrary conclusion, the Court of Appeal relied in the last instance on the fact that "the jury necessarily found the evidence of interdependence among the participants in the crimes to be persuasive, having found true all of the gang enhancements against all appellants." (*Ware, supra*, 52 Cal.App.5th at p. 942.) We draw a different lesson. If anything, the likelihood the jury relied on evidence of interdependence between members of the 5/9 Brim gang underscores the risks of confusing gang membership with participation in a conspiracy to commit murder in a long-running, large-scale, nonspecific conspiracy like the one charged here. If the prosecution had charged Hoskins with conspiracy to commit murder in connection with any particular incident allegedly part of this conspiracy, no reasonable jury could have found Hoskins guilty based on the evidence presented at trial. At most, the prosecution would be able to rely on his membership in the gang, association with violent members, general glorification of violence on social media, and isolated behavior that had a speculative link to any particular incident. But because the prosecution had alleged that Hoskins was part of a much broader conspiracy, it was permitted to introduce evidence connecting a number of disparate events across multiple years and tying Hoskins to two alleged coconspirators, both of whom were much more strongly implicated in particular acts of violence linked to the conspiracy. (See *id.* at pp. 940–941.) The risk of jury confusion makes it all the more vital for courts to carefully distinguish between evidence of mere membership in a gang embroiled in a violent rivalry, on the one hand, and evidence sufficient to support a conviction for conspiracy to commit murder, on the other.

## III.

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Ware

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 52 Cal.App.5th 919
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S263923
**Date Filed:**  December 1, 2022

_____

**Court:**  Superior
**County:**  San Diego
**Judge:**  Leo Valentine, Jr.

_____

**Counsel:**

Nancy Olsen, under appointment by the Supreme Court, for Defendant and Appellant Nicholas Hoskins.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Steve Oetting and Christine L. Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nancy Olsen
Attorney at Law
P.O. Box 231153
Encinitas, CA 92023-1153
(760) 753-5206

Christine L. Bergman
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9159