Filed 6/5/25  P. v. Lazaro CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064321 |
| v. | (Super. Ct. No. RIF1804114) |
| ENRIQUE LAZARO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Joshlyn R. Pulliam, Judge. Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Enrique Lazaro guilty of second degree murder. (Pen. Code,[1] § 187. subd. (a).) He contends the jury should have instead convicted him of voluntary manslaughter because the prosecution failed to disprove beyond a reasonable doubt his claim that he was provoked into a heat of passion. (§ 192, subd. (a).) We reject the contention because substantial evidence supports the judgment. We affirm.

FACTS

I.

THE KILLING

In 2014, then 25-year-old Lazaro, met 19-year-old N.G. The couple married about one year later.

N.G.'s first pregnancy was unsuccessful. By the spring of 2017, she became pregnant again, but soon discovered Lazaro had a mistress. Lazaro left N.G. in May and filed for divorce in June. N.G. was introduced to Arturo Angel in August and gave birth to her son in December.

Lazaro began trying to reconcile with N.G. after their son was born. By February 2018, Lazaro correctly suspected N.G. was dating another person, but she denied it. N.G. would later testify that, at that time, she was "in a way playing with [Lazaro's] emotions because [she] was still hurt." She then realized she pitied him because she no longer loved him. In March, there was a physical altercation between Lazaro and Angel.

For the sake of their son, N.G. tried to live with Lazaro in an attempt to reconcile. She testified it lasted only three or four days because she concluded she "couldn't be with him." The "last day" of her relationship with Lazaro was in early August, when they went to a storage center to

---

[1] All undesignated statutory references are to the Penal Code.

divide their personal property. Although N.G. dated Angel exclusively from that point on, she continued to have contact with Lazaro, whose communications increased.

Lazaro and N.G. knowingly had software on their cell phones that tracked the other's physical location. In addition to her trackable phone, N.G. had two other phones, and she would regularly change phone numbers. Lazaro would sometimes use N.G.'s phone to capture screenshots to send to Angel. Out of fear and to calm Lazaro down, N.G. would occasionally say she loved him.

Around noon on September 14, 2018, Lazaro confronted N.G. and Angel in the parking lot of a shopping center where Angel worked. Angel was with N.G. in her parked vehicle when Lazaro pulled his truck behind N.G.'s vehicle, blocking it. Angel and N.G. both initially got out of her vehicle but N.G. went back inside.

The parking lot had a security camera that recorded visual images only. An investigator who later interviewed N.G. also reviewed the video. The investigator testified that, based on his experience, after Lazaro ducked down behind the car, his movements were consistent with racking a handgun and concealing it. Lazaro then talked to Angel outside of the vehicle; N.G. could not hear their conversation.

Angel returned to the car and told N.G. to go with Lazaro. Angel stayed at the shopping center while N.G. followed Lazaro to a nearby parking lot. Lazaro showed N.G. a gun and fired it into the air. Lazaro was frustrated because N.G. was with Angel. Lazaro told N.G. that he was ready to kill Angel if she did not leave with him. N.G. and Lazaro went to a park where Lazaro gave N.G. a bullet. She would later testify that Lazaro told her "that bullet was going to be for [her] if [she] were to go back with [Angel]."

3

When Lazaro reached out the next day about possibly going to the beach, N.G. said she could not meet him because she was going to a family gathering. After leaving her aunt's house, N.G. picked up Angel and later parked about a half mile from his house to talk about their relationship. To make Angel feel better, N.G. called Lazaro on speakerphone and asked when Lazaro and N.G. had last been physically intimate. After Lazaro stated it had been "a while," N.G., in order to "play [it] cool" and end the call, suggested to Lazaro that they might meet later.

Lazaro found the call "very odd" and used the phone software to track N.G. After she did not pick up his calls, Lazaro texted several messages to her, including: "The wrath of God is going to fall on you." About an hour later, Lazaro arrived to see N.G. kissing Angel while on top of him in the passenger seat of her car.

The window of Angel's door was open and Lazaro tried to open the passenger door as he pointed his gun at Angel's head. Lazaro started "being rough, trying to force [his gun] in [Angel's] mouth." Angel raised his hand and opened his mouth. Lazaro fired the gun inside Angel's mouth, killing him.

N.G. started screaming. Lazaro went to her on the other side of the vehicle and pulled the keys from the ignition. Lazaro requested N.G. to help bury Angel's body. N.G. told Lazaro she would give him 20 minutes before calling the police, fearing she might also be shot, and Lazaro left.

## II.

### THE TRIAL

Lazaro was arrested two days after the killing and interviewed by an investigating officer. The testimonies of N.G., Lazaro, and the officer all included commentary on the recording of the parking lot events the day

before the killing, which was played for the jury. Lazaro claimed that what the investigator thought was a gun was instead Lazaro's cell phone.

Lazaro also disputed many points of N.G.'s testimony about the events described above. For example, he claimed he never threatened N.G. the day before the killing, that she "snatched" a bullet from his hand instead of him handing it to her, and that it had been N.G.'s idea to go to the beach the following day.

Lazaro also claimed that, the day before the killing, Angel taunted him by saying N.G. and Angel had engaged in intercourse in all of Lazaro's vehicles and that he would not be needed if Lazaro "'could take care of business.'" Lazaro also claimed that within a month of the killing, he and Angel had talked, and Angel had made threats against Lazaro, N.G., and their son.

Lazaro testified that, on the night of the killing, he took out his gun in part because he saw Angel reach down for something, but "mostly out of the emotions that [he] was going through, . . . the rage that [he] was going through." He described that his feelings "fog[ged]" his mind.

Lazaro claimed Angel guided the gun into his own mouth in a "challenging way." Lazaro testified that the gun fired because he "was distracted . . . trying to open the door" and that he felt "some type of pressure at [his] hand." Lazaro left the scene because he was in shock; he denied N.G.'s claim that he asked her to help bury Angel's body.

During closing arguments, the prosecutor argued that Lazaro had committed willful, deliberate, and premeditated first degree murder. Lazaro's counsel argued that N.G. had been engaged in an affair and that the sequence of events leading to the killing amounted to sufficient provocation to mitigate liability to manslaughter.

The jury was instructed, inter alia, on the concept of provocation for both determining the degree of murder liability (CALCRIM No. 522) and, alternatively, for deciding whether Lazaro should be guilty of voluntary manslaughter instead of murder (CALCRIM No. 570). The jury was also instructed on CALCRIM No. 226, which addresses the jury's role of determining witness credibility.

The jury found Lazaro not guilty of first degree murder, guilty of second degree murder (§ 187, subd. (a)), and that he caused the death by personally and intentionally discharging a firearm (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)). Lazaro filed an unsuccessful motion to reduce his conviction to voluntary manslaughter, pursuant to section 1181. The trial court considered mitigation of Lazaro's sentence based on claims of childhood abuse and lack of criminal history, but noted those factors did not minimize the violence of the crime. The court then imposed a prison term of 15 years to life, plus 25 years to life for the firearm enhancement, for a total term of 40 years to life.

## DISCUSSION

As noted, Lazaro contends the prosecutor did not meet his trial burden to demonstrate Lazaro was guilty of murder rather than voluntary manslaughter due to heat of passion provocation.

### I.

#### STANDARD OF REVIEW

In reviewing a claim of insufficient evidence, we ""review the entire record in the light most favorable to the judgment,"" and then determine whether it contains "'evidence that is reasonable, credible, and of solid value'" such that a reasonable jury could have found the defendant guilty beyond a reasonable doubt. [Citations.] . . . [¶] We must "'presume in

6

support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence . . . ' . . . for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citations.]"'" (*People v. Ware* (2022) 14 Cal.5th 151, 167 (*Ware*).)

## II.

### LAW ON PROVOCATION

Malice aforethought is a necessary element of murder, other than felony murder. (§ 188, subd. (a)(3).) By contrast, the lesser included offense of "[m]anslaughter is the unlawful killing of a human being without malice." (§ 192; see *People v. Duff* (2014) 58 Cal.4th 527, 561.)

As the jury was correctly instructed in this case, "heat of passion" voluntary manslaughter (§ 192, subd. (a)) requires an alignment of three elements: (1) "The defendant was provoked"; (2) "As a result . . . , the defendant acted rashly and under the influence of intense emotion that obscured [the defendant's] reasoning or judgment"; and (3) "the provocation would have caused a person of average disposition to act rashly and without due deliberation . . . from passion rather than judgment." (CALCRIM No. 570; accord *People v. Beltran* (2013) 56 Cal.4th 935, 942.) "'[I]t is not a matter of law but a matter of fact for the jury in each case to determine under the circumstances of the case whether the assault or whether the blow, or whether the indignity or whether the affront, or whatever the act may be, was such as is naturally calculated to arouse the passions, and so lessen the degree of the offense by relieving it from the element of malice.'" (*Beltran*, at pp. 950–951.)

Heat of passion provocation can be based on taunting that does not immediately precede the killing, but a killer cannot set up his or her

7

"'own standard of conduct'"—it is the jury's role to determine the reasonableness of any taunting as legal mitigation for the defendant's reaction. (*People v. Berry* (1976) 18 Cal.3d 509, 515.) At trial, it is a prosecutor's burden to negate at least one of the three heat of passion elements beyond a reasonable doubt. (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 643.)

## III.

### ANALYSIS

We review the record to determine whether substantial evidence supports a jury finding against at least one heat of passion element, beyond a reasonable doubt. (*Ware, supra*, 14 Cal.5th at p. 167.) We conclude substantial evidence supports an implied jury finding that any provocation was insufficient to cause a person of average disposition to act rashly and without due deliberation.

Consistent with our conclusion, the jury could have reasonably disbelieved Lazaro's version of the events. For example, Lazaro claimed Angel taunted him about having "intercourse with [N.G.] in all of [Lazaro]'s cars and that he[, Angel,] would not be needed if [Lazaro] could take care of business." But Lazaro's only support was his own trial testimony, with no corroborating evidence. The jury could have reasonably rejected his claim of taunting. (See CALCRIM No. 226 [addressing jury's prerogative to assess testimony as not credible and its significance].)

8

True, there was undisputed evidence that could have supported contrary jury findings.[2] But that is not the light with which we view the record. (*Ware, supra*, 14 Cal.5th at p. 167.) Lazaro presents no factual ground to override the jury's decision on heat of passion.

Nor does Lazaro present analogous precedent to show there was insufficient evidence in this case. For example, he cites to *People v. Borchers* (1958) 50 Cal.2d 321, 330 (*Borchers*) as an instance of the California Supreme Court concluding there was insufficient evidence to negate a heat of passion element. The defendant in *Borchers* was engaged to a woman who was unfaithful to him. The woman pointed a gun at the defendant, and then taunted him to shoot her before he actually fired. (*Id.* at pp. 325–326.) The jury convicted the defendant of second degree murder, but the trial court granted relief, on defendant's motion pursuant to section 1181, by reducing the conviction from murder to voluntary manslaughter. (*Id.* at pp. 323, 328.) The high court affirmed. (*Id.* at p. 330.)

*Borchers* is factually inapposite to the events that transpired in this case. Equally important, *Borchers* is precedent for a *trial* court overriding a jury determination on provocation. Its affirmance rests on an appellate conclusion that substantial evidence supported what the trial court factually determined, as authorized by section 1181. (See *Borchers, supra*, 50 Cal.2d at p. 328 ["From the evidence viewed as a whole[,] the trial judge could well have concluded that defendant was roused to a heat of 'passion'"].) In this case, implementing the same deference to factfinding would result in

_____

[2] For example, N.G. acknowledged that, about six months before the killing, she "in a way play[ed] with [Lazaro's] emotions" because she was still hurt by him. Also around that time, it was undisputed that Lazaro and Angel engaged in a physical altercation with each other.

affirming the judgment because, as noted, here the trial court agreed with the jury's decision on provocation by denying Lazaro's section 1181 motion to reduce his conviction. *Borchers* is both factually and analytically unhelpful to Lazaro. Given that substantial evidence supports the jury's verdict, there is no ground for reversal.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOTOIKE, J.


DELANEY, J.


10