Filed 8/26/24  P. v. Hiriarte CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B325448 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA044027) |
| v. | |
| DANIEL THOMAS HIRIARTE et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Lillian Vega Jacobs, Judge.  Affirmed.

Julie Caleca, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Thomas Hiriarte.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant Christopher DeHerrera.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant Anthony William Salazar.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Daniel Thomas Hiriarte, Christopher DeHerrera, and Anthony William Salazar (collectively, defendants), who were convicted of first degree murder in 1998, appeal from orders denying their petitions for resentencing after an evidentiary hearing under Penal Code former section 1170.95 (now section 1172.6).[1]  Each defendant challenges the sufficiency of the evidence supporting his conviction for murder based on the trial court's finding that defendants entered into a conspiracy to commit murder.  We reject defendants' contentions of error and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

At approximately 3:00 a.m., on May 31, 1997, Victor Vaca was shot and killed in the parking lot of an apartment complex, located within the territory of the 18th Street gang and around a block away from rival Maywood Locos gang territory.  A .45-caliber bullet and two .357-caliber bullets were recovered from Vaca's body.  Defendants, three members of the Maywood

_____

[1] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

Undesignated statutory references are to the Penal Code.

Locos gang,[2] were charged with and convicted of Vaca's murder. This crime is the subject of defendants' petitions for resentencing.

The information filed in this case further charged defendant Salazar, alone, with a separate murder and attempted murder that allegedly occurred on April 5, 1997, and an assault with a firearm that allegedly occurred on January 25, 1997. With respect to all crimes, the information alleged Salazar personally used a firearm (§ 12022.5, subd. (a)(1)), and a principal was armed with a firearm (§ 12022, subd. (a)(1)).

We take our account of the facts and circumstances of the shooting from the reporter's transcripts of defendants' joint trial. The trial court received and considered these transcripts at the evidentiary hearing on defendants' petitions for resentencing. In the present appeals, we granted defendant DeHerrera's request for judicial notice of the trial record in this case, including the reporter's transcripts of the trial.

## A. Evidence Presented Regarding the Murder

### 1. *Ongoing war between 18th Street and Maywood Locos gangs*

Lay witnesses testified at defendants' trial about an ongoing and violent rivalry between the Maywood Locos and 18th Street gangs. Jack Zebris, a Maywood Locos member, indicated that at the time of the Vaca shooting, Maywood Locos was "having problems" with 18th Street and the two gangs did not get along. He was aware of shootings between the two gangs. Steve Medina, a trial witness who testified regarding one of the alleged incidents charged against Salazar only, stated he lived in 18th

---

[2] Defendants did not dispute at trial and they do not dispute here that they were members of the Maywood Locos gang at the time of the Vaca shooting.

Street gang territory, and indicated he was aware of "a big ongoing war between 18th Street and Maywood Locos" around the time of that other incident (less than two months before the Vaca shooting).

Zebris stated that Slauson Avenue is the boundary between the two gangs. Huntington Park Police Department Detective John Navarrette, one of the lead investigators of the Vaca shooting, testified that Maywood Locos territory was to the north of Slauson Avenue (in Maywood) and 18th Street territory to the south (in Huntington Park), and members of these two gangs would cross Slauson to "conduct missions to get at the enemy." Navarrette further testified that the apartment complex where Vaca was killed was known to him "as an 18th Street hangout spot."

2. *Maywood Locos member Jack Zebris's interaction with defendants minutes before the Vaca shooting*

Zebris, who was initially a suspect in the Vaca murder, but no longer by the time of trial, testified under a grant of immunity. He identified himself and all three defendants as Maywood Locos gang members. He stated he had known DeHerrera (whom he referred to as "Kunta") since elementary school. He met Salazar (known to him as "Psycho") in 1991, the same year he (Zebris) joined the Maywood Locos. He met Hiriarte (known to him as "Midget") a few years later. Around the time of the Vaca shooting, Zebris would see defendants every day in Maywood.

Zebris testified that he had once seen Salazar with a .45-caliber gun and had seen him with a 9-millimeter gun on a couple occasions (not on the date of the Vaca shooting). Between four and seven hours before the Vaca shooting, Zebris was at a Maywood Locos hangout spot on 53rd Street, and he observed

4

DeHerrera with a small, lightweight, chrome .357-caliber gun; Zebris held the gun. He testified that a .357-caliber gun he was shown in court at defendants' trial (which was used in the Vaca shooting) was not the same gun he had seen DeHerrera with hours before the shooting. According to Zebris, the gun he observed in court was larger.

Zebris stated that in the early morning hours of May 31, 1997, shortly before the shooting (which occurred at approximately 3:00 a.m.), he was riding through Maywood Locos territory in a car driven by fellow gang member "Largo," when they spotted Salazar spray painting graffiti at the corner of 57th or 58th Street and Everett Avenue. Largo stopped the car and offered Salazar a ride. Salazar accepted and asked Largo to drop him off at the intersection of 57th Street and Carmelita Avenue, approximately two blocks north of Slauson Avenue, the boundary separating Maywood Locos from 18th Street territory. When they arrived at the drop-off point, Zebris observed that Hiriarte and DeHerrera were there. Zebris indicated it was "kind of weird" for them to meet up there because it was not a typical Maywood Locos hangout spot. They usually congregated around 53rd or 54th Street.

Salazar exited the car, and Hiriarte indicated he wanted Zebris to join them by saying to Zebris, " 'Come on' " and/or " 'Let's go.' " Zebris exited the car, too, and went to join them. Largo reminded Zebris that he was supposed to do Largo a favor by helping him find a place to obtain rock cocaine. Zebris decided to go with Largo, and he returned to the car. He heard Salazar say, " 'We don't need him.' " It appeared to Zebris that Salazar was "pissed off" that he refused to go with them.

As Zebris rode away with Largo, he observed Salazar, DeHerrera, and Hiriarte walking south on Carmelita Avenue toward Slauson Avenue (a distance of around two blocks).  Within 5-10 minutes, while Zebris and Largo were riding through Maywood, Zebris saw patrol units and police helicopters in the area.  He did not witness a shooting.

Zebris recalled that Salazar was wearing a blue and yellow jacket as defendants walked toward Slauson Avenue.  Zebris did not observe any of the defendants carrying a gun when he interacted with them just before the Vaca shooting.

Zebris stated that the day after the shooting, he saw Hiriarte on 54th Street, and it appeared to him that Hiriarte was "pissed off" at him.  He did not speak with any of the defendants about the shooting.

The prosecutor asked Zebris if he knew what defendants were going to do when he saw them walking toward Slauson Avenue.  He responded, "Yeah, kind of.  You going that way? Yeah."  On cross-examination, however, when asked if he knew what defendants were going to do or where they were going, he replied, "Not really."

3. *Javier Perez's eyewitness account of the Vaca homicide*

Javier Perez, who testified at trial, witnessed the shooting of his cousin Vaca on May 31, 1997, at approximately 3:00 a.m. At that time, Perez, Vaca, Vaca's brother Juan,[3] and their friend Pedro were eating fast food in the parking lot of the apartment complex where Vaca and Juan lived.  The entrance to that

_____

[3] Because we refer to murder victim Victor Vaca as "Vaca" throughout this opinion, we will refer to Juan Vaca by his first name to avoid confusion, and not out of disrespect.

parking lot is on Carmelita Avenue, around one block south of Slauson Avenue (and around three blocks from where Zebris saw defendants minutes before).[4] Perez had heard that 18th Street gang members lived at the apartment complex but denied that he, Vaca, Juan, or Pedro associated with any gang.

Perez stated that moments before the shooting, he was sitting down talking to Vaca, who was standing. They were near the entrance to the apartment complex, and Juan and Pedro were around 20 meters away, near Juan's van. Two men approached Vaca and asked him if he and Perez were "the ones from the 18." Vaca told the men they did not know anyone who "belonged to the 18." The two men immediately began shooting at Vaca. After he heard the first gunshot, which came from a "big caliber gun," Perez saw Vaca fall to the ground, and Perez took cover behind a vehicle in the parking lot. The gunfire continued. At first, Perez heard more shots from the big gun, and then he heard additional shots from a different, smaller caliber gun. When the gunfire stopped, Perez stood up and saw the two men running through the parking lot toward the street. He did not see a third man. Perez observed that Vaca had been shot multiple times in the head and chest.

Perez testified that one of the men who approached Vaca wore a blue and yellow jacket. He did not tell the detective who interviewed him the morning of the shooting about the jacket, but when a detective later showed him the jacket during a

---

[4] Detective Navarrette testified that at the time of the shooting, there was a car wash on Carmelita just south of Slauson Avenue, and next to it an empty lot, and then the apartment complex where Vaca and Juan lived.

subsequent interview, he immediately recognized it as the jacket one of the shooters was wearing.

During the investigation of the shooting, a detective showed Perez multiple six-pack photo lineups, and Perez did not identify anyone as a shooter. At trial, Perez testified that Salazar and DeHerrera looked familiar to him, but he could not "say with any kind of certainty" that they were the ones who shot Vaca.

4. *Security guard Daniel Gonzalez observes Salazar and two men running away from the area of the shooting immediately thereafter*

Daniel Gonzalez, who testified at trial, worked for a private security services company, providing patrol security. At approximately 3:00 a.m., on May 31, 1997, he was driving his daily patrol route, which included the intersection of Carmelita and Slauson Avenues. As he drove westbound on Slauson toward Carmelita and approached the first limit line at that intersection, he heard a gunshot. By the time he crossed through the intersection, he had heard around 10 gunshots. He was familiar with the apartment complex at issue here and believed the shots were coming from the parking lot in that complex. He made a U-turn, intending to drive to the police station in Maywood to report the shooting.

Gonzalez testified that as he drove eastbound on Slauson Avenue, approaching the intersection with Carmelita Avenue, three men ran across Slauson in front of his patrol vehicle, heading north on Carmelita. He did not observe anyone else in the area. The men were running in a line, one in front of the other and came within 15 feet of his vehicle. He noticed that the man in the middle of the line wore a blue and yellow jacket and

was making motions at his waistband with both hands as if he were trying to keep a heavy object like a gun from falling out of his pants. Gonzalez watched the man's hands, concerned that he might have a weapon and turn it on Gonzalez.

Gonzalez stated that as he was looking for the entrance to the police station, he "noticed a lot of police vehicles going towards the scene." He drove to the apartment complex and reported what he had observed to officers.

5. *Maywood Police Officer Carlos Alvarez detains Salazar three blocks from the crime scene; the other two men flee*

Carlos Alvarez, a patrol officer for the City of Maywood, testified at trial. He stated that minutes after 3:00 a.m., on May 31, 1997, he received a radio broadcast regarding suspects fleeing the scene of a homicide at Carmelita and Slauson. He drove his patrol car to the area, and within three minutes of the radio broadcast, he located three men running westbound on 56th Street from Carmelita Avenue, around three streets away from the crime scene.[5] He exited his patrol car and ordered the men to stop. One complied, and Alvarez detained him. The other two men ran northbound through yards of houses and were not caught. In court, at defendants' trial, Alvarez identified Salazar as the man he detained, referring to him by his Maywood Locos

---

[5] According to Officer Tua, from the Huntington Park Police Department, Officer Alvarez told him he saw a total of two men running, not three, and that is what Tua wrote in his police report regarding the Vaca shooting. Alvarez testified at trial that he remembered seeing three men running, and Tua made a mistake in writing the report.

gang moniker, Psycho. Alvarez could not identify the two men who fled.

Alvarez testified that Salazar was wearing a blue and yellow jacket when he detained him. Alvarez identified the jacket in court. Another officer from the Maywood Police Department, who responded to assist Alvarez, searched Salazar and recovered a fully loaded 9-millimeter pistol from his waistband and a can of red spray paint from his right front pants pocket. There was no evidence the 9-millimeter firearm was used in the Vaca shooting.

6. *Investigation of the Vaca homicide*

a. *Gonzalez identifies Salazar in the field*

Officers transported security guard Gonzalez from the crime scene to the location where Salazar was detained to determine if Gonzalez could make an identification. Gonzalez recognized the blue and yellow jacket Salazar was wearing and identified him as one of the three men who had run in front of his patrol car. Later, when officers showed Gonzalez six-pack photo lineups, he was unable to positively identify any of the three men.

b. *Graffiti at the crime scene*

Officer Ronald Davis from the Huntington Park Police Department, who testified at trial, was one of the investigating officers on the Vaca homicide, along with Detective Navarrette. He stated that when he arrived at the crime scene after the shooting, he noticed graffiti on a wall directly across the street from the crime scene. He observed 18th Street gang graffiti, including the number 18 and gang members' names. There was fresh red spray paint covering the 18th Street graffiti: there were letters representing the Maywood Locos gang; and the number 18 was crossed out and a 7 painted next to it to make 187. Davis

identified the painted-over 18th Street graffiti in photographs the prosecutor showed him.

Davis testified that he compared the fresh red paint on the wall with the spray can recovered from Salazar's pocket, and observed that they were the same color. He also examined the blue and yellow jacket Salazar was wearing and found specks of red on it.

        c.     *Officers recover the .357-caliber firearm used in the shooting*

The parties stipulated at trial that Vaca died from five gunshot wounds—two to his chest, two to his right temple, and one to his shoulder. Shortly after the shooting, officers recovered a .357-caliber firearm from a trash bin near the crime scene. It was later determined that two of the bullets in Vaca's body were fired from that firearm.

        d.     *Salazar's hands are tested for gunshot residue*

An hour or more after Salazar was brought to jail after his arrest, Officer Davis used a kit to test Salazar's hands for gunshot residue. When he was finished, he secured the kit and sent it for processing. The criminalist who analyzed the kit testified at trial that she did not find gunshot residue, and therefore, the result was inconclusive, meaning she could not determine whether Salazar had fired a gun. She explained that 90 percent of gunshot residue particles are lost within the first hour; and a person can remove all particles from their hands by washing them or wiping them on clothing.

        e.     *The .45-caliber gun used in the Vaca shooting is recovered from inside a car, near Salazar*

At some point after his May 31, 1997 arrest, Salazar was released from jail. On July 15, 1997, Officer David Alvarado from

11

the Upland Police Department responded to a citizen complaint and came into contact with Salazar. Alvarado testified at trial that when he responded to the location, he found Salazar lying down in the back seat of a vehicle with his head behind the driver's seat. Another man was in the driver's seat. Alvarado ordered the men to exit the vehicle and then he searched it. He recovered a loaded .22-caliber revolver from the front floorboard on the passenger side of the vehicle, and a loaded .45 caliber firearm from the rear floorboard on the driver's side. The latter firearm was within reaching distance of Salazar.

The parties stipulated at trial that the .45-caliber firearm recovered on July 15, 1997 was used in the Vaca shooting, and at least one of the bullets found in Vaca's body was fired from that gun.

7. *Gang expert testimony*

Adrian Punderson testified at trial as the prosecution's gang expert. He was a police officer for 13 years, and he retired the year before the Vaca shooting. During his last seven years as a police officer, he ran a gang task force.

Punderson stated that he recognized defendants as Maywood Locos gang members. Throughout his career as a police officer, he had daily interactions with the Maywood Locos (and its predecessor gang).

Punderson testified that when he was a police officer, he "was charged with dealing with" the 18th Street gang, which he described as "probably the most powerful gang in Southern California," and the most violent gang in the Los Angeles area. Through that work, he became familiar with the rivalry between 18th Street and Maywood Locos. He explained at trial how and why that rivalry developed over the years. He was aware of

12

"some pivotal incidents that occurred that really spurred and flared up the violence between the two groups," beginning in 1990 or 1991. The prosecutor asked him if he was familiar with a specific incident that occurred around three weeks before the Vaca shooting in which an 18th Street member shot a Maywood Locos member. Punderson stated he did not have any personal knowledge of that specific incident, but he had heard that it occurred.[6]

Punderson described the area of Huntington Park around Slauson and Carmelita as a "notorious hangout for the 18th Street gang members" and explained that Slauson was a "territorial line" between 18th Street and Maywood Locos. He was aware of "documented missions" in which 18th Street and Maywood Locos gang members crossed Slauson to shoot at each other.

Punderson indicated Maywood Locos would only go into 18th Street territory for a "business purpose" (i.e., to conduct a mission) because it constitutes "a direct disrespect to a rival's neighborhood to enter into that neighborhood without having permission to do so." He opined that if three Maywood Locos members armed with two or more guns crossed Slauson on Carmelita, that would be consistent with the three Maywood Locos "doing a mission" against 18th Street. They would be "looking to take some course of action." He defined a mission as when gang members "get together and load up in a group and head out to handle whatever their business may be. [¶] This is consistent with all gangs in that area so far as they may be

---

[6] The prosecutor also asked Zebris about this specific incident, and Zebris denied knowledge of it.

13

committing a burglary, they may be committing a robbery, they may be committing -- planning to do a drive-by shooting. Things of that nature."

Punderson opined that it would enhance the reputation of the Maywood Locos if some of its members crossed Slauson into 18th Street territory and shot and killed someone there. He also testified that the manner in which a hypothetical shooting (mirroring the facts of this case) was carried out is consistent with an "edict" from the Mexican Mafia in or around 1994, that gangs conduct walk-up shootings rather than drive-by shootings to avoid accidentally killing innocent bystanders (e.g., children) instead of an intended target.

Punderson indicated that once Maywood Locos "cross south of Slauson Avenue, it's life or death for them." Therefore, they conduct missions in a group, so they have the backup of their fellow gang members, and they "take care of and defend each other."

The prosecutor showed Punderson photographs of the graffiti on the wall across the street from the scene of the Vaca shooting. Punderson testified that placing Maywood Locos graffiti on a wall south of Slauson Avenue is a "show of disrespect" and would serve as a challenge to 18th Street. He also stated that writing 187, the Penal Code section for murder, means "death to everyone from . . . that group" and indicates a "life-and-death challenge." He explained, "you'll oftentimes see that" (graffiti with 187) when "there is an intense rivalry" between "two gangs that are warring and shooting and killing each other." During cross-examination, Punderson testified that not every person who writes 187 on a wall has an intent to kill. He also testified on cross-examination that not every gang

14

member who carries a gun does so because "he intends to affirmatively shoot someone who is unarmed"; some carry guns for protection because of where they live.

## B.      Procedural History

### 1.       *Trial and direct appeal*

Before closing argument at defendants' trial, the court granted the prosecution's motion to dismiss the three attempted murder counts, the assault with a firearm count, and the personal firearm use allegations against Salazar.  The case went to the jury on the two murder counts (the Vaca murder at issue in this appeal, and the unrelated murder charge against Salazar only).

The prosecution's theory regarding the Vaca murder was that defendants entered into an (uncharged) conspiracy to commit murder.  As pertinent to defendants' petitions for resentencing, the trial court instructed the jury on the elements of conspiracy (CALJIC No. 6.10.5) and also informed the jury that a member of a conspiracy is guilty not only of the crime he and his coconspirators agreed to and did commit, but is also liable for the natural and probable consequences of any crime a coconspirator committed to further the object of the conspiracy, even if the crime was not intended as part of the agreement between the coconspirators (CALJIC No. 6.11).  In closing argument, the prosecutor told the jurors that under the instructions they were given, they could convict a defendant of murder under the natural and probable consequences doctrine if they concluded the defendant participated in the conspiracy with an understanding that the group was conspiring to commit a lesser crime.

15

The jury found defendants guilty of the first degree murder of Vaca, and found Salazar not guilty on the other murder charge. The court sentenced each defendant to a state prison term of 25 years to life.  Defendants appealed, and we affirmed the judgments of their convictions.  (*People v. Salazar* (Mar. 29, 2000, B127918) [nonpub. opn.].)

2. *Petitions for resentencing and first appeal from orders denying the petitions*

In 2018, the Legislature enacted Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Sen. Bill No. 1437 (2017-2018 Reg. Sess.) Stats. 2018, ch. 1015, § 1(f), p. 6674; §§ 188, subd. (a)(3) & 189, subd. (e).)  Senate Bill No. 1437 amended sections 188 (defining malice) and 189 (felony murder) and added former section 1170.95, now renumbered section 1172.6, which established a procedure for vacating murder convictions and resentencing defendants who could no longer be convicted of murder in light of the amendments to sections 188 and 189 made effective January 1, 2019.  (Stats. 2018, ch. 1015, § 4, pp. 6675–6677.)

Defendants each filed a petition for resentencing under former section 1170.95, now section 1172.6.  After counsel was appointed for each defendant, and various hearings were held, the trial court denied the petitions without holding an evidentiary hearing, and defendants appealed.  As we explained in our opinion in those prior appeals, "In each case, the trial court

16

concluded that [defendants] were ineligible for relief under [former] section 1170.95 as a matter of law because their convictions were based on the uncharged conspiracy, and were not based on either felony murder or the natural and probable consequences doctrine." (*People v. Salazar* (Feb. 18, 2022, B309409) [nonpub. opn.].) We concluded the trial court erred because the record of defendants' convictions did not establish as a matter of law that defendants were convicted under a still-valid theory of murder liability (conspiracy to commit murder) rather than a now-invalid theory (the natural and probable consequences doctrine). (*Id*. at pp. 7-12.) We reversed the orders denying the petitions and remanded with directions for the trial court to issue orders to show cause why defendants were not entitled to relief under former section 1170.95. (*Id*. at pp. 12-13.)

       3.     *Evidentiary hearing on the petitions for resentencing*

Upon remand, the trial court reappointed counsel for each defendant. Salazar's counsel filed a brief, arguing the prosecution could not prove beyond a reasonable doubt that Salazar "possessed any form of malice," and therefore, the trial court was required to vacate his murder conviction. The trial court set the matter for an evidentiary hearing.

At the outset of the October 17, 2022 evidentiary hearing, the trial court referenced the prosecution's burden to prove beyond a reasonable doubt that defendants are guilty of murder under the law as amended by Senate Bill No. 1437, and acknowledged the trial court's role as an independent fact finder. The court indicated it had received and considered the reporter's and clerk's transcripts from defendants' trial, the portions of the prior appellate opinions setting forth the procedural history of

17

this case, and the papers filed in connection with the petitions for resentencing.

The prosecutor informed the trial court that the prosecution was proceeding under the theory of conspiracy to commit murder—a still-valid theory of murder liability after the enactment of Senate Bill No. 1437—which requires proof that each member of the conspiracy had the specific intent to kill. The prosecution relied on the evidence from defendants' trial (summarized above) in arguing it met its burden of proof beyond a reasonable doubt that defendants are guilty of murder under current law.

Salazar's counsel made a blanket objection to gang expert Punderson's testimony on the ground the testimony "was based upon hearsay from other officers or hearsay from other perspective [*sic*] gang members." Counsel cited *People v. Sanchez* (2016) 63 Cal.4th 665 as support for the objection. (*Id*. at p. 686 [expert may not "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception"].) DeHerrera and Hiriarte joined in the objection, which the trial court overruled.

Hiriarte testified at the evidentiary hearing. He denied the following: (1) that he was at the scene of the Vaca shooting; (2) that he had a gun on his person that night; (3) that he intended to kill anyone that night; (4) that he was with Salazar or DeHerrera at the time of the shooting; and (5) that Zebris was a Maywood Locos gang member. Hiriarte admitted that he, himself, was a Maywood Locos member, and stated he "had seen [Zebris] around before," but did not "know him on a personal basis."

18

After discussing the facts of the case with the parties, and hearing argument, the trial court denied the petitions, ruling as follows:

"I find that the defendants are guilty beyond a reasonable doubt based on the conspiracy to commit murder. This court finds each individual defendant had the specific intent required and each had the specific intent to kill. Each defendant made overt acts. The overt acts being meeting up, leaving where they met up and walking together toward the scene of the shooting. They were armed with firearms.

"The agreement is clear based on circumstantial evidence which is given the same degree of weight as direct evidence. They are all three armed and they quickly as soon as they meet up almost immediately walk to the scene where Mr. Vaca is killed.

"It wasn't as if the three went in separate directions. It wasn't as if the three, upon having the shooting take place, ran in different directions. They were all three together.

"In terms of the evidence I reviewed, that agreement the court feels can be construed based on circumstantial evidence. The motive being as was shown at trial there was rivalry, bad blood, between 18th Street and Maywood Locos.

"And I would just again point out the context. The context, it's a very short window. It's 3:00 in the morning. It's not like a lot of people are on the streets. Nobody ever mentions any other people beyond the three, the three that are testified to as being the defendants before the court today by Mr. Zebris, three people as observed by a civilian, security guard Daniel Gonzalez. Nobody else is referenced.

19

"So as the court, acting as an independent fact finder, again finds that beyond a reasonable doubt each individual defendant had the specific intent to kill and is guilty of murder under the law taking into account [Senate Bill No. 1437], now codified as Penal Code section 1172.6. So for those reasons, the petitions are denied."

## DISCUSSION

In separately filed briefing, each defendant challenges, under state law, the sufficiency of the evidence supporting his conviction for murder based on the trial court's finding that defendants entered into a conspiracy to commit murder.[7] Each defendant also makes federal constitutional claims regarding the sufficiency of the evidence.

### A. Section 1172.6 and Standards Applicable to the Evidentiary Hearing

If a defendant files a facially sufficient petition for resentencing and makes a prima facie case for relief under section 1172.6, as in this case, the trial court must issue an order to show cause and "hold a hearing to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts . . . ." (§ 1172.6, subd. (d)(1).) At the hearing, the burden of proof is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as

---

[7] Defendants raise many of the same arguments in their separate briefing. For efficiency's sake, where arguments overlap, we have not separately addressed each argument by defendant.

In their briefing, Hiriarte and DeHerrera each state that they join in the arguments raised by the other two defendants.

20

amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) The parties may rely on "evidence previously admitted at any prior hearing or trial that is admissible under current law," and they "may also offer new or additional evidence to meet their respective burdens." (*Ibid*.) "At the evidentiary hearing, the trial court acts as an independent fact finder." (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

"[W]e review the trial court's factual findings for substantial evidence. [Citation] 'We " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " ' [Citation.] We review the whole record, 'not just the evidence favorable to the respondent[,] to determine if the evidence supporting the verdict is substantial in light of other facts.' " (*People v. Underwood* (2024) 99 Cal.App.5th 303, 314 (*Underwood*).) "We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. [Citation.] We must 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.)[8]

**B.  Legal Principles Regarding Conspiracy to Commit Murder**

The elements of a criminal conspiracy are: "(1) the existence of an agreement between at least two persons; (2) the

---

[8] DeHerrera argues the appropriate standard of review should be independent review because the judge who ruled on the

specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." (*People v. Ware* (2022) 14 Cal.5th 151, 163 (*Ware*).)  Conspiracy to commit murder requires intent to kill (express malice), "and 'is necessarily conspiracy to commit premeditated and deliberated first degree murder.' " (*Id.* at p. 167.)

 " ' "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime.' " ' [Citation.]  'Evidence of an agreement does not require proof that the parties met and expressly agreed; a criminal conspiracy can be shown through circumstantial evidence.'  [Citation.]  'If the agreement between the conspirators is the crux of criminal conspiracy, then the existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed, particularly since such agreement must often be proved circumstantially.  " 'The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302-303 (*Navarro*).)  " ' "The agreement in a conspiracy may be shown by . . . conduct of the defendants in mutually carrying out

---

petition did not preside over defendants' trial and decided this matter on a cold record (the trial transcripts) without live testimony (other than Hiriarte's denials).  "[A]ppellate courts that have considered this argument have uniformly rejected it," and we have no cause to revisit the issue.  (See *Underwood*, *supra*, 99 Cal.App.5th at pp. 313-314.)

an activity which constitutes a crime." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1111.)

The prosecution must prove a "defendant's knowledge of, and specific intent to further, the group's unlawful ends." (*Ware*, *supra*, 14 Cal.5th at p. 165.)  The law does not permit "a rule of guilt by association" with the group.  (*Ibid*.)  In reviewing the sufficiency of the evidence, we must "carefully distinguish between evidence of mere membership in a gang embroiled in a violent rivalry and evidence sufficient to support a conviction for conspiracy to commit murder." (*Id.* at p. 166.)  The "prosecution is not required to establish precisely how the defendant intended to achieve the ends of the conspiracy or that the defendant's chosen means were effective in achieving those ends." (*Ibid*.) "But ultimately, to connect any individual to the charged conspiracy, the prosecution must at least establish that the individual specifically intended to agree to commit the criminal offense and to play at least some role in achieving it." (*Id.* at pp. 166-167.)

## C.    Analysis

### 1.    *Sufficiency of the evidence*

Considering "the evidence in its entirety," as is our task (*Ware*, *supra*, 14 Cal.5th at p. 168), we conclude substantial evidence supports each defendants' murder conviction based on the theory of an uncharged conspiracy to commit murder. Specifically, there is substantial evidence that each defendant had the specific intent to agree to commit murder and the specific intent to commit murder (intent to kill, express malice). Defendants' murder convictions do not rest on evidence of their gang membership and association, and nothing more, as they contend.  (Cf. *id.* at p. 156 [evidence was insufficient to support a

23

conviction for conspiracy to commit murder where the "charged conspiracy consisted of a two-year-long agreement among at least 20 gang members to kill members of rival gangs, without agreement as to any specific times, persons, or places where killing would take place," and "[t]here was no evidence that [the defendant] had committed or participated in any act of violence"].)

As described above, shortly before 3:00 a.m., Salazar directed Largo to drop him off at a location where Maywood Locos gang members did not typically congregate. DeHerrera and Hiriarte were already there, waiting for Salazar. Hiriarte sought to recruit Zebris to go with them. When he declined, Salazar angrily said they did not "need" Zebris. A reasonable inference from this evidence is that the three defendants—who had arranged to meet in the early morning before dawn, two blocks north of the border between their territory and that of their rival gang—could complete their mission on their own without Zebris's assistance. As Zebris rode away with Largo, Salazar, DeHerrera, and Hiriarte walked south on Carmelita Avenue, directly toward 18th Street gang territory.

DeHerrera's suggestion that the defendants could have walked someplace other than the apartment complex where Vaca was killed ignores the substantial evidence in the record that the three of them were at the crime scene at the time of the shooting (a matter of minutes after they left Zebris). According to eyewitness Perez, one of the men who approached Vaca was wearing the same blue and yellow jacket Salazar was wearing when he was detained by Officer Alvarez minutes after the shooting. There was a very short window of time (10-15 minutes at most) between when Zebris saw Salazar, DeHerrera and

24

Hiriarte walking directly toward the crime scene and when security guard Gonzalez and Officer Alvarez observed Salazar and two men running away from the area of the crime scene immediately after the shooting.[9] The reasonable inference from the evidence is that DeHerrera and Hiriarte accompanied Salazar to the crime scene to carry out the group's mission, and they were the two men seen running with Salazar when he was detained. An unreasonable inference from the evidence is that Salazar met up with two different men during this short window of time, and DeHerrera and Hiriarte went elsewhere.

The manner in which the shooting was conducted is substantial circumstantial evidence that murder was the mission defendants came together to carry out. The evidence shows the shooting was efficient, calculated, and coordinated. Salazar, DeHerrera, and Hiriarte walked to a known 18th Street gang hangout; two of them confronted Vaca about his affiliation with 18th Street; they immediately fired several rounds into his head and chest with two different guns; one or more of them tagged a wall with Maywood Locos graffiti that incorporated a reference to the Penal Code section for murder; and within a couple minutes of arriving at the scene, the three of them fled together. While the evidence shows there were only two shooters, it also indicates that all three defendants remained at the scene until the mission was completed and remained together thereafter. Salazar's comment, before heading to the crime scene, about the group not

---

[9] Defendants walked three blocks south on Carmelita Avenue to the 18th Street hangout, and, after completing the shooting, ran back to Maywood Locos territory along the same route, all within five to ten minutes.

needing Zebris for what they were about to do, indicates each defendant had a role to play.[10]

To the extent Vaca was not an 18th Street gang member, this does not tend to show the shooting was an "impulsive act" rather than a "preconceived plan," as Hiriarte maintains. Hiriarte also references the Mexican Mafia "edict" as evidence the shooters acted impulsively in killing a non-gang member. To the contrary, the evidence indicates defendants' preconceived plan was to go into 18th Street territory, quickly find a target, shoot to kill, and return to Maywood Locos territory within a matter of minutes. Vaca became the target; there is no evidence he was killed accidentally as an innocent bystander.

As we explained above, the fact finder may infer the existence of a conspiracy " ' " 'from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " ' " (*Navarro, supra,* 12 Cal.5th at pp. 302-303.) Substantial evidence supports the trial court's findings based on proof beyond a reasonable doubt that each defendant is guilty of murder based on the theory he conspired to commit the murder. Given our conclusion, we need not address

---

[10] We note there is substantial evidence that defendants came to the crime scene with at least three loaded firearms between them: the .45-caliber and .357-caliber firearms used in the shooting, and the 9-millimeter gun Salazar was carrying in his waistband when he was detained immediately after the shooting. Our evaluation of the sufficiency of the evidence, however, does not depend upon a finding that each of the three defendants was carrying his own firearm.

further defendants' federal constitutional claims regarding insufficiency of the evidence.

2. *Challenges to gang expert testimony*

As summarized above, at defendants' trial, lay witnesses Zebris, Medina, and Detective Navarrette testified about the violent rivalry between the 18th Street and Maywood Locos gangs that existed around the time of the Vaca shooting. Officer Davis testified about the graffiti he observed on a wall across the street from the scene of the shooting, and photos of the graffiti were admitted into evidence. Defendants did not object to the admissibility of any of this evidence at the evidentiary hearing on their petitions for resentencing, and they do not challenge it in the present appeals.

Defendants do challenge, however, the admissibility of gang expert Punderson's testimony, which they contend provides the only evidence supporting the elements of a criminal conspiracy to commit murder and, specifically, their intent to kill. In particular, they challenge Punderson's testimony that he had heard about an incident three weeks before the Vaca shooting in which an 18th Street member shot a Maywood Locos member, and his testimony regarding the meaning of the graffiti found on the wall across the street from the crime scene.

In *People v. Sanchez* (2016) 63 Cal.4th 665, 684, the California Supreme Court held, " '[C]ase-specific out-of-court statements' cited by an expert witness to support an expert opinion are offered for their truth. [Citation.] Such evidence must therefore be admissible under an exception to the hearsay rule or supported by competent evidence in the record." (*Navarro, supra,* 12 Cal.5th at p. 309.) " 'The limitations that *Sanchez* placed on expert testimony concern case-specific

27

information that an expert relates to a jury, not materials upon which the expert relies.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 457.) "[I]t is not improper under *Sanchez* for an expert to *consider* and *rely on* case-specific hearsay in forming his or her opinions." (*Ibid*.)

Under *Sanchez*, Punderson's testimony regarding a rivalry between 18th Street and Maywood Locos was admissible based on his expertise and experience with these two gangs. (See *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1138 (*Anthony*) ["Under *Sanchez*, [expert] was not required to personally replicate all investigations dating back to the inception of the NSO-Berkeley gang rivalry in 2002 in order to relate general information about those two gangs and their rivalry"].) His testimony regarding a *specific* shooting that occurred three weeks before the Vaca shooting, however, is inadmissible because it is case-specific information offered for its truth that he related to the jury, and there is no admissible evidence in the trial record regarding such a specific shooting.

However, any error in admitting this particular testimony is harmless beyond a reasonable doubt. (See *Navarro*, *supra*, 12 Cal.5th at p. 310 [erroneous admission of testimonial hearsay evidence under *Sanchez* "requires reversal unless we conclude 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained' "].) We have not relied on Punderson's testimony regarding a specific shooting in concluding substantial evidence supports each defendant's murder conviction under current law. And there is no indication in the 53-page transcript from the hearing on the petitions for resentencing— during which the trial court specifically mentioned particular evidence from defendants' trial—that the trial judge relied on

Punderson's testimony regarding a specific shooting in ruling on the petitions. The court stated in its ruling that the motive for the Vaca shooting "as was shown at trial . . . was rivalry, bad blood, between 18th Street and Maywood Locos."[11] Competent evidence certainly established that this rivalry and bad blood existed in May 1997, through lay witness testimony and Punderson's testimony regarding the general rivalry. Moreover, the freshly painted graffiti across the street from the crime scene, matching the color of the spray paint can in Salazar's pocket, depicted the violent rivalry between Maywood Locos and 18th Street contemporaneously with the shooting. The graffiti is strong substantial evidence that the rivalry was the motive for the shooting and that defendants highlighted the rivalry at the crime scene as part of the mission they were completing. In addition, the inquiry made by one of the shooters immediately before they commenced firing ("[are you] the ones from the 18") is also evidence on this point.

In testifying about the graffiti, Punderson relied on photos of the graffiti to which defendants did not object. Thus, there was no *Sanchez* error in admitting Punderson's testimony regarding the graffiti. (See *Anthony*, *supra*, 32 Cal.App.5th at p. 1139 ["attack on [expert]'s extensive testimony about photographs of

---

[11] In response to argument by Salazar's counsel regarding Punderson's testimony, the trial court stated, "[W]e don't hear about gangs only through the testimony of Mr. Punderson. It is Jack Zebris that also puts context into the rivalry between the Maywood Locos and 18th Street[,] and Mr. Perez who testifies that the individuals who approach immediately reference 18th Street. So it is not only Mr. Punderson who was putting -- who was bringing up 18th Street and who is giving context to what happened that early morning."

defendants' tattoos and gang signs" fails "because [expert] did not rely on hearsay to testify that defendants had the tattoos or made the hand signs in question. Rather, he relied on other evidence that defendants do not contend was inadmissible"].)

Salazar argues Punderson's testimony about the graffiti is erroneous to the extent it indicated defendants had the specific intent to kill. There was no error in this regard. The prosecution may properly "elicit[] expert testimony to provide the [fact finder] with information from which the [fact finder] may infer the motive for a crime or the perpetrator's intent," but the expert may not "testify[] to his or her opinion of the knowledge or intent of a defendant on trial." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551; *People v. Vang* (2011) 52 Cal.4th 1038, 1047 & fn. 2.) Punderson did not opine that any defendant in this case acted with intent to kill, and he acknowledged that not every person who writes 187 on a wall has an intent to kill.[12] The trial court could properly consider Punderson's testimony, along with all of the other evidence to reach its own conclusion whether the prosecution had met its burden of proving each defendant's intent, and that is exactly what happened here.

We have no cause to reverse the trial court's orders denying the petitions for resentencing. As analyzed above, substantial evidence, properly considered by the trial court, demonstrates

---

[12] On cross-examination, Salazar's counsel pressed Punderson on whether writing 187 on a wall necessarily "equals" intent to kill, and Punderson made clear that was not his opinion.

each defendant had the specific intent to agree to commit murder and the specific intent to commit murder.

**DISPOSITION**

The October 17, 2022 orders denying the petitions for resentencing are affirmed.

NOT TO BE PUBLISHED


KELLEY, J.*


We concur:


ROTHSCHILD, P. J.


BENDIX, J.

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.