Filed 12/2/25  P. v. Garcia CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>FRANCISCO ALEJANDRO GARCIA,<br><br>    Defendant and Respondent. | F089452<br><br>(Super. Ct. No. BF201025A)<br><br><br>**OPINION** |

        APPEAL from an order of the Superior Court of Kern County.  Andrew Kendall, Judge.

        Cynthia J. Zimmer, District Attorney, and Anthony Yim, Deputy District Attorney, for Plaintiff and Appellant.

        Monique Boldin and Siena Kautz, under appointment by the Court of Appeal, for Defendant and Respondent.

-ooOoo-

## INTRODUCTION

The magistrate held defendant Francisco Alejandro Garcia to answer for conspiracy to commit murder and another charge but found insufficient evidence to hold him to answer for murder and other charges at his preliminary hearing. An information was filed later, containing both charges. The trial court granted defendant's motion to dismiss the information. The People appeal. We conclude that sufficient evidence was presented at the preliminary hearing to hold defendant to answer. We shall reverse the order and direct the trial court to deny defendant's motion.

## PROCEDURAL BACKGROUND

The District Attorney of Kern County filed a complaint on September 4, 2024, charging defendant with murder (Penal Code, § 187, subd. (a)),[1] conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a)), assault with a semiautomatic firearm (§ 245, subd. (b)), two counts of carrying a loaded firearm while an active participant in a criminal street gang (§ 25850, subd. (c)(3)), and participation in a criminal street gang (§ 186.22, subd. (a)). The complaint also alleged the murder was premeditated and deliberate (§ 189), committed by means of lying in wait (§ 190.2, subd. (a)(15)) and in aid of a criminal street gang (§§ 186.22, subd. (b)(5), 190.2, subd. (a)(22)), and a principal discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)). The complaint further alleged the conspiracy to commit murder and assault with a semiautomatic firearm were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A), (B)).

At the preliminary hearing on January 10, 2025, the magistrate found sufficient cause to believe that defendant conspired to commit murder and participated in a criminal street gang and found the gang allegation (§ 186.22, subd. (b)(1)(A)) as to conspiring to commit murder true. However, the magistrate discharged and dismissed the remaining

---

[1] Undesignated statutory references are to the Penal Code.

counts and their associated allegations, having found insufficient cause to believe defendant committed the offenses charged therein.

The district attorney filed an information on January 16, 2025, charging defendant with murder (§ 187, subd. (a); count 1), conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a); count 2), and participation in a criminal street gang (§ 186.22, subd. (a); count 3). The information further alleged the murder was premeditated and deliberate (§ 189), committed by means of lying in wait (§ 190.2, subd. (a)(15)), and carried out to further a criminal street gang (§ 190.2, subd. (a)(22)) as to count 1. The information additionally alleged that the crimes were committed in aid of a criminal street gang (§ 186.22, subd. (b)(5)) and a principal discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)) as to counts 1 and 2.

Defendant and four other individuals who participated in the September 29, 2021 shooting were charged in a separate case, Kern County Superior Court case No. BF198856ABCDE, with additional offenses arising from a December 24, 2021 shooting. The prosecutor moved to consolidate both cases.

Defendant moved to set aside the information due to insufficient evidence pursuant to section 995. The trial court granted defendant's motion to set aside the information and denied the prosecutor's motion to consolidate as moot on February 11, 2025. The trial court denied the prosecution's motion for reconsideration on March 5, 2025. This court issued an order denying the prosecution's petition for writ of mandate filed in Kern County Superior Court case No. BF201025A and the application for an immediate stay in Kern County Superior Court case No. BF198856C on March 6, 2025.

The People appeal the trial court's February 11, 2025 order dismissing the information.

**FACTS**

Bakersfield Police Department Officer Kayla Wainwright testified that she was dispatched to a sports complex on September 29, 2021, at approximately 10:26 p.m., to investigate a reported shooting. She saw the victim, later identified as Mario Bravo,[2] laying on the ground with a gunshot wound to the face. Although she attempted to resuscitate Mario, he did not respond and was not breathing.

According to Mario's brother, Onorio B., he and Mario had played softball at the sports complex. They went to their vehicle in the parking lot at approximately 10:15 p.m. An individual who identified himself as "Ulices" approached them for assistance in obtaining a ride. Onorio described Ulices as approximately 16 years old and six feet tall, initially using a cell phone. They offered to provide Ulices a ride home. They had been speaking with Ulices for about 15 minutes when Ulices pulled out a black pistol with an extended magazine and fired at them. Ulices shot Mario in the head, and Mario dropped to the ground as Onorio ducked behind a vehicle. Ulices fired approximately five to 10 shots before he fled on foot toward the street entrance to the complex. Wainwright noticed a gunshot through a window of Onorio's vehicle.

Bakersfield Police Department Officer Nicole Madsen also responded to the shooting and interviewed James S. who advised that he was talking with friends in the parking lot, heard what he believed were fireworks, and saw a man shooting a firearm with an extended magazine behind him while running away. The individual ran toward a green sedan with tinted windows that was stopped on the street near the parking lot entrance. Another witness noticed defendant earlier that evening because he did not have any sport's equipment and was loitering the parking lot. She saw him fleeing after Mario was shot.

---

[2]     Pursuant to California Rules of Court, rule 8.90, and for clarity and convenience because some persons share a last name, we refer to certain persons by their first names and/or initials. No disrespect is intended.

Bakersfield Police Department Detective Lance O'Nesky testified that he responded to the shooting to investigate the scene. Mario was on the ground, and O'Nesky observed one gunshot wound to Mario's left cheek and one toward the back of Mario's neck. He observed a bullet hole in the driver door window and a bullet hole in the headrest of the front passenger seat of Onorio's vehicle. O'Nesky saw a trail of bullet casings from Mario's body toward the street entrance to the sports complex, consistent with someone firing as they ran away. He recovered six nine-millimeter shell casings and another .40-caliber casing on the street near the parking lot entrance.

Kern County Sheriff's Office Detective Aaron Barajas testified about an attempted murder in which four gang members shot at two victims on December 24, 2021. Defendant was identified by one of the victims, and investigation determined that defendant had been accompanied by Uriel Ramirez, Ulices Zelayandia, and Eric Faria. Defendant told Barajas during a postarrest interview that defendant used the rap name of "Soldier Gordo" and identified his social media account. Ramirez identified his social media account that used the name "Uriel X3." Faria used the name "Tronn Wit A Choppa" for his social media account. Ramirez, Zelayandia, and Faria were arrested with cell phones that Barajas used to connect them to the December 24, 2021 shooting. The location information obtained for the cell phones indicated that Zelayandia's cell phone traveled from his residence to defendant's residence, to Ramirez's residence, and then directly to the location of the December 24, 2021 shooting.

Bakersfield Police Department Detective Kyle McNabb testified he was the lead investigator assigned to the September 29, 2021 shooting. He learned from Mario's wife that Mario dropped out of the Okie Bakers criminal street gang and she and Mario testified in 2015 against Sureño gang members who shot her in the stomach while she was pregnant. McNabb also obtained information from an employee at the sports complex that she had noticed an individual hanging around the evening of the shooting

5.

whom she had not seen before and stood out to her because he did not have any sporting equipment with him. She observed the individual loitering around the parking lot and later saw him fleeing towards the parking lot street entrance while firing a gun. The individual had arrived sometime between 8:00 p.m. and 9:00 p.m.

McNabb eventually identified Ulices Alonso as a suspect in the September 29, 2021 shooting after receiving a photograph of defendant and Faria and a tip that they were involved in Mario's death. While investigating defendant and Faria and their social media accounts, McNabb identified Ulices Alonso as having been photographed with defendant and present during multiple contacts with defendant. Two witnesses to the incident identified Alonso as the individual who shot Mario from a photographic lineup. McNabb located a group chat between defendant, Alonso, Ramirez, Faria, and Zelayandia in their social media accounts, commencing at 7:47 p.m. the evening Mario was killed.[3] McNabb also obtained a search warrant for Ramirez's cell phone and obtained location information of the phone during the hours leading up to, and including, the shooting.[4]

At approximately 7:47 p.m., defendant attempted a video call with Alonso and then messaged, "[M]y Pop wants Y," followed by, "[Y]ou." Defendant and Alonso then engaged in a one-minute audio call. McNabb testified that defendant's father is known as "Big Soldier," is a member of the Colonia Bakers criminal street gang, and has status in the gang. His residence, where defendant also lives, is a common hangout used by the gang.

---

[3]     Alonso used the account "Been.That 600"; Ramirez used the account "Uriel 3X"; Faria used the account "Tronn With A Choppa"; and Zelayandia used the account "It's Ully."

[4]     McNabb obtained defendant's cell phone records, which had been seized by law enforcement, and determined that defendant's cell phone was not in use during the time period of the shooting.

At approximately 7:58 p.m., defendant messaged Ramirez, "Aye, yo, answer the phone," and then engaged in a video chat.

At approximately 8:27 p.m., defendant messaged Ramirez, "Me and Ully[5] here." Ramirez responded, "Where," and defendant replied, "Front, and hurry up," at 8:30 p.m.

At approximately 8:37 p.m., defendant initiated a video chat with Faria and then messaged Faria, "Coke out," which, followed by, "Come," and then "her," was believed by McNabb to be a correction intended to read, "Come here." At 8:51 p.m., Ramirez's cell phone was in the area of Faria's residence, and Ramirez uploaded a photograph of himself in the back seat of a vehicle.

At 8:47 p.m., defendant messaged Alonso, "On my way."[6] At 8:56 p.m., defendant and Alonso participated in an audio call, and Ramirez's cell phone was in an area consistent with travel from Alonso's residence to the sports complex. Ramirez then uploaded another photograph of himself in the back seat of a vehicle, depicting the entrance to a highway leading to the sports complex.

At approximately 9:21 p.m. and 9:22 p.m., Ramirez uploaded multiple videos of himself in the back seat of a vehicle, and his cell phone location showed he was in the area of the sports complex. At approximately 9:24 p.m., Ramirez's cell phone location showed him in the same area, and at 9:25 p.m., Ramirez uploaded another video showing himself in the back seat of a vehicle while the phone was in the area of the sports complex.

At 9:40 p.m., Ramirez's cell phone showed him in an area on the north side of the complex.

---

**5** Zelayandia used the social media account "It's Ully," indicating defendant may have been with Zelayandia, although Zelayandia and Alonso share the first name of Ulices.

**6** If Alonso was not yet accompanying defendant, he was most likely traveling with Zelayandia who was also known as Ully.

At approximately 9:46 p.m., defendant messaged Alonso, "Where," and then, "At," and Alonso responded, "About to bat." The September 29, 2021 shooting occurred between 10:15 p.m. and 10:30 p.m. and was reported to law enforcement at approximately 10:26 p.m.

At approximately 10:18 p.m., Ramirez received two incoming calls from Faria, one lasted 15 seconds and the other 12 seconds. At 10:23 p.m., Ramirez messaged the group, "Pickup. Let's go," and then, "Burnt." Defendant messaged, "WYM" (what do you mean), followed by, "Never mind." At 10:24 p.m., Faria messaged the group, "Hurry up, man," and at the same time, Zelayandia attempted a video chat with the group. These communications suggest that Ramirez, Faria, and defendant were not together at this time, or they would have presumably just spoken to each other.

Ramirez's cell phone was used to access a scanner radio application at 10:29 p.m. and 10:44 p.m., supporting an inference that he was monitoring any police response to the shooting. At 10:33 p.m., Ramirez's cell phone was in the area of Faria's residence. At 10:57 p.m., Ramirez messaged his sister, "Sis, hot shit." Ramirez's sister responded, "Way," with several question marks. Ramirez responded, "Gordo's,"[7] while his cell phone was in the area of defendant's residence.

McNabb explained that defendant was coordinating the pickup of the individuals involved in the group chat at the sports complex where Mario was playing softball and that they were looking for Mario based upon the messages "Where at" and "About to bat."

Investigation determined that the .40-caliber bullet casing had been fired from a gun seized from Faria's residence, which had also been depicted in the photograph received from the anonymous source. The firearm was distinctive in that the slide was

---

[7] Defendant used the name "Official Soldier Gordo" in the group chat.

gold and inscribed with the word "Tronn," a name used to identify his social media account.

The parties stipulated that Colonia Bakers was a criminal street gang. The prosecution's gang expert testified to facts, gave his opinion that defendant and Alonso were active participants in the Colonia Bakers criminal street gang, and stated that retaliation against an individual who had previously testified against Sureño gang members would benefit the Colonia Bakers criminal street gang.

## DISCUSSION

### I. *Sufficient evidence presented at the preliminary hearing established that defendant engaged in a conspiracy to commit murder.*

The People argue that the evidence presented at the preliminary hearing established facts sufficient to hold defendant to answer to the charge of conspiracy to commit murder and the trial court erred in granting defendant's motion to dismiss it. We agree.

#### A. Standard of Review and Applicable Law

Pursuant to section 995, a court properly sets aside all or part of an information upon finding that "the defendant had been committed without reasonable or probable cause." (§ 995, subd. (a)(2)(B).) " ' " 'Reasonable or probable cause' means such a state of facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*People v. Mower* (2002) 28 Cal.4th 457, 473.)

"To establish probable cause sufficient to overcome a section 995 motion, 'the People must make some showing as to the existence of each element of the charged offense.' [Citation.] 'Evidence that will justify a prosecution need not be sufficient to support a conviction.' " (*People v. Scully* (2021) 11 Cal.5th 542, 582 (*Scully*).) "[A]n indictment or information should be set aside only when there is a total absence of

evidence to support a necessary element of the offense charged." (*People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226.) " 'We will not set aside an information "if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." ' " (*Scully*, at p. 582.)

" 'On review … the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate .…' " (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.) Insofar as the motion "rests on consideration of the evidence adduced, we must draw all reasonable inferences in favor of the information [citations] and decide whether there is probable cause to hold the defendant[] to answer.' " (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072.)

"[A]lthough there must be *some* showing as to the existence of each element of the charged crime [citation] such a showing may be made by means of circumstantial evidence supportive of reasonable inferences on the part of the magistrate." (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1148.) "However, … an information will not be set aside merely because each element of the charged crime is not established by direct testimony. Rather, the inquiry is whether the evidence … discloses circumstances from which the magistrate might reasonably have inferred the existence of each element of the charged crime." (*Id.* at pp. 1148–1149.)

"A reviewing court may not substitute its judgment as to the weight of the evidence for that of the magistrate, and, if there is some evidence to support the information, the court will not inquire into its sufficiency." (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.)

" 'Pursuant to section 182, subdivision (a)(1), a conspiracy consists of two or more persons conspiring to commit any crime. A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together

with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' " (*Scully, supra*, 11 Cal.5th at p. 583.)

" ' "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime.' " ' [Citation.] 'Evidence of an agreement does not require proof that the parties met and expressly agreed; a criminal conspiracy can be shown through circumstantial evidence.' [Citation.] 'If the agreement between the conspirators is the crux of criminal conspiracy, then the existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed, particularly since such agreement must often be proved circumstantially. " 'The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302–303.) "It is frequently necessary to infer the existence of a conspiracy through [such] circumstantial evidence .…" (*Munoz v. Superior Court* (2020) 45 Cal.App.5th 774, 780.) " ' "The agreement in a conspiracy may be shown by … conduct of the defendants in mutually carrying out an activity which constitutes a crime." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1111.)

**B.      Analysis**

We conclude that the evidence presented at the preliminary hearing was sufficient to cause a person of ordinary caution and prudence to believe and conscientiously entertain a strong suspicion that defendant tacitly agreed to kill Mario based upon the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.

The evidence permits a reasonable inference that defendant contacted Alonso on behalf of defendant's father, a member with status in the gang; defendant's father provided instruction to Alonso; and then defendant gathered other gang members together

11.

to implement the direction given to Alonso. Defendant attempted a video call to Alonso, then messaged that his father desired to speak with Alonso, and then engaged in a video call with Alonso. Defendant lived at the same residence as his father, permitting a reasonable inference from the sequence of events that defendant was with his father when he communicated with Alonso. Alonso shot Mario point blank in the face shortly after this conversation, supporting a reasonable inference that the murder was the subject of Alonso's conversation with defendant's father, another member of the gang with status.

Thereafter, defendant traveled to each conspirator's residence, communicated to each when he arrived, and instructed each conspirator to come to the vehicle. Defendant engaged Ramirez in a video chat at approximately 7:58 p.m. and announced to Ramirez that he had arrived out front with "Ully" at approximately 8:30 p.m., allowing a reasonable inference that defendant and Zelayandia drove to Ramirez's residence to pick him up. It is also reasonable to assume that defendant and Zelayandia were in the front seat when they picked up Ramirez and Ramirez sat in the back seat (confirmed by Ramirez's pictures of himself sitting in the back seat). Ramirez's cell phone location provided information as to where Ramirez was located and, by reasonable inference, defendant as well, since they were together.

Several minutes later, defendant communicated to Faria, "Come," indicating he (along with Zelayandia and Ramirez who uploaded a photograph of himself in the vehicle) had arrived to pick up Faria. Defendant then messaged Alonso at 8:47 p.m., that defendant was on his way and next participated in an audio call with Alonso at 8:56 p.m. At 8:56 p.m., Ramirez's cell phone records show it was in an area consistent with leaving Alonso's residence while in route to the sports complex, providing a reasonable inference that all five individuals were on their way to the sports complex.

The prosecution's map of the sports complex does not show any other nearby businesses or residences, supporting a reasonable inference that the location of Ramirez's

cell phone at the sports complex was in support of a purpose to be performed at the complex. Testimony of a witness placed Alonso outside of defendant and Zelayandia's vehicle during various portions of the evening and provided evidence that he was not there to use the sports complex's facilities. Ramirez's cell phone location information and uploaded photographs show that Ramirez, and by reasonable inference his companions, were at the sports complex 9:21 p.m. through 9:40 p.m.

At 9:46 p.m., defendant asked Alonso, "Where," and then, "At?" Alonso responded, "About to bat." Since defendant had picked Alonso up from his residence, defendant would presumably have observed that Alonso did not have sports equipment (as the witness who saw him testified) and have known that Alonso had not been dropped off at the sports complex to play baseball or softball. Therefore, when defendant asked, "Where" and "At?" and received the response, "About to bat," one may infer that Alonso understood the question as referring to the location of Mario who was at the sports complex playing ball (according to Onorio).

Onorio and Mario were in the parking lot near their vehicle at approximately 10:15 p.m., half an hour after defendant's inquiry to Alonso. Alonso approached Onorio and Mario to discuss obtaining a ride, an obvious ploy to engage them in conversation, as the evidence shows Alonso had a ride from his conspirators who were still in the area and with whom he was in contact. Sometime between 10:15 p.m. (when Mario and Onorio went to their vehicle) and 10:26 p.m. (when the first officer was dispatched to the sports complex), Alonso opened fire on the brothers and killed Mario. At 10:23 p.m., Ramirez messaged the group, "Pick up," "Let's go," and "Burnt." Defendant argues that he could not have been present at the sports complex because, according to Ramirez's photographs, Ramirez was in the back seat of the car and would have no reason to message defendant for a ride if defendant was also in the car. However, another reasonable inference from these facts is that either Ramirez or defendant was somewhere

13.

other than the vehicle and walking around the sports complex during the time that they waited on Alonso.

Additionally, officers later found a casing from Faria's gun along Alonso's flight route from the parking lot to the car. These two facts support a reasonable inference that Faria and either Ramirez or defendant had, at some point, left the vehicle to assist Alonso. If Ramirez was in the car, he could have been alerting the other conspirators that they needed to answer their phones because he was trying to let them know that they needed to go because someone was seen making a call to the police. If Ramirez was not in the car, his message could have been to alert the conspirators in the vehicle that they needed a ride because the shooting had taken place. When defendant responded with "WYM" and a question mark, he may have been confused as to why Ramirez texted, "Burnt." Ramirez's cell phone shows that he was monitoring the police response after the killing and that he, as well as the others in the vehicle, returned to defendant's residence thereafter.

Defendant argues that the evidence established only that defendant was a member of a gang and generally associated with the other conspirators. He relies upon *People v. Orozco* (2025) 114 Cal.App.5th 343 (*Orozco*) in support of his argument. In that case, as the appellate court described: "On a deadly driveby mission, Daniel Orozco ventured into hostile gang territory. A shooter in Orozco's car used Orozco's gun to wound one man and kill another. The jury convicted Orozco of murder, attempted murder, and conspiracy to murder." (*Id.* at p. 345.) The court reversed Orozco's conviction for conspiracy to commit murder because it concluded the trial court erred in allowing the prosecution to add the charge on the first day of trial and the preliminary hearing had failed to provide proper notice of the new charge. (*Ibid.*)

The appellate opinion describes the facts, appearing to summarize them from the prosecutor's opening statement at trial. (*Orozco, supra*, 114 Cal.App.5th at pp. 345–346.)

14.

The prosecutor asserted that "[g]ang warfare was the motive," based upon expert testimony that gang members inspire fear by killing rival gang members. (*Id.* at p. 346.) Orozco, Adrian Nunez, and Isaac Miranda were gang members. (*Ibid.*) Nunez drove Orozco's vehicle, accompanied by Orozco, Miranda, and Martinez Garibo, who was an associate of the gang, in the front passenger seat holding Orozco's gun. (*Ibid.*) They entered rival gang territory on a hunt and fled after Garibo shot and wounded a rival gang member. (*Ibid.*) Thereafter, they returned to the area, and Garibo shot and killed another victim who did not actually belong to a gang. (*Ibid.*) An officer opined that he committed the shootings seeking membership status in the gang. (*Id.* at p. 347.)

After a witness telephoned a description of the car, police found the car shortly after the shooting, arrested Orozco and the other three men, and retrieved Orozco's gun after it was tossed. (*Orozco, supra*, 114 Cal.App.5th at pp. 346–347.) The gun and ammunition matched the bullets and casings from the shooting. (*Id.* at p. 347.) Orozco's cell phone showed it had been at the locations of the two shootings. (*Ibid.*) Garibo admitted to the shooting under interrogation before being advised of his rights, and the admission was excluded from the preliminary hearing. (*Ibid*.)

At the preliminary hearing, the magistrate held Orozco to answer on charges of murder and attempted murder, despite having suppressed the confession of Garibo, one of Orozco's conspirators. (*Orozco, supra*, 114 Cal.App.5th at p. 347.) Garibo told officers that he was driving Orozco's car because Orozco " 'was unable to' " and " '[l]ike under the influence probably.' " (*Ibid*.) Defense counsel introduced Garibo's suppressed confession to argue that Orozco had been too intoxicated to form criminal intent. (*Ibid.*)

The appellate court found that without Garibo's suppressed description of events, the evidence at the preliminary hearing could not support a murder conspiracy because there was no evidence that Orozco agreed to kill someone. (*Orozco, supra*, 114 Cal.App.5th at pp. 348–349.) On appeal, the prosecution maintained that, even

15.

without Garibo's statement, the evidence sufficed. (*Id.* at p. 349.) According to the prosecution's description of the evidence, it showed gang members, including Orozco, were together in a car when they entered rival territory and, by expert testimony, that gang members "typically 'put in work' for the gang," meaning that gang members typically act to support the gang's goals of killing rivals and intimidating potential witnesses. (*Ibid.*) The appellate court concluded that this evidence did not show Orozco agreed that someone in his group of four would kill a human being on the night in question because there was no evidence that murder is the only action gang members take when they gather. The four could have had plans other than murder, such as to eat, rescue a friend from a jam, vandalize something, or no agreed purpose at all for the trip. (*Ibid.*)

We find *Orozco, supra*, 114 Cal.App.5th 343 of limited assistance in our analysis, however, because we cannot discern from the appellate court's recitation of the trial evidence which of the facts described originated from Garibo's confession and, therefore, cannot ascertain the evidence presented at the preliminary hearing. The recitation of facts also suggests that without Garibo's confession, there was no evidence to suggest the purpose of car ride was to target rival gang members. However, we conclude that the evidence of the events prior to the shooting, including the phone calls, gathering of gang members, and the conspirators loitering in the area of the sports complex for approximately one hour and 15 minutes before the shooting distinguishes the facts of this case, which provide evidence that shooting Mario because he had testified against the gang was the object of their combined actions.

Defendant also relies on *People v. Ware* (2022) 14 Cal.5th 151 (*Ware*), wherein our Supreme Court recently cautioned that proof of common gang membership alone is not enough to establish participation in a criminal conspiracy. "The effect of such a rule would be to criminalize mere association with gang members, which the law forbids." (*Id.* at p. 168.) Nicholas Hoskins was a member of a gang, the other members of which

were engaging in killings that Hoskins supported on social media after they occurred, and he was charged with participating in a long-running, large-scale, nonspecific conspiracy to commit murder. (*Id.* at p. 175.)

Evidence of an individual's membership in the gang, association with violent members, general glorification of violence on social media, and isolated behavior with a speculative link to any particular incident is insufficient to prove a conspiracy to commit murder. (*Ware, supra*, 14 Cal.5th at p. 175.) Our Supreme Court considered evidence that Hoskins was a member of the gang and friends with gang members with whom he regularly communicated by social media but concluded it was not sufficient evidence that he intended to participate in a conspiracy to commit murder. (*Id.* at p. 168.) The People's evidence failed to establish that Hoskins membership in a gang subset demonstrated his intent where it failed to show the subset's mission was only to kill and without evidence of the membership requirements or internal workings of the subset. (*Id.* at p. 169.) The court also noted that evidence of gang rules and norms could be relevant in assessing an individual's participation in a conspiracy, such as evidence that becoming a gang member necessarily involved a choice to participate in a conspiracy to commit murder, but no such evidence was provided at trial. (*Id.* at pp. 169–170 [no reasonable jury could have inferred that membership entailed an agreement by all members to kill rivals without more specific evidence about the requirements of membership].)

While the People attempted to argue that Hoskins's elevated status in the gang meant he was involved in gang decisionmaking, the court found insufficient evidence that he had such status or to support a conclusion that his status necessarily meant that he would have been involved in the decision to kill rivals. (*Ware, supra*, 14 Cal.5th at p. 170.) The court found that the evidence as to a particular shooting Hoskins was alleged to have been involved established only that he was good friends with the other gang member responsible for the shooting and had associated with the shooter sometime

17.

in the past. Although Hoskins posted a photograph taken seven hours before the shooting, the court disagreed with the prosecutor's argument that it showed Hoskins's intent to lure rivals to the subsequent shooting and, therefore, failed to indicate an intent to aid and abet the murders. (*Id.* at p. 172.) Finally, Hoskins's social media posts of support after the murders did not reflect his knowledge of the murders before they happened or that he had participated in them. (*Id.* at pp. 173–174.)

"The evidence showed that Hoskins was an active member of a gang whose other members committed acts of violence, that he celebrated those acts of violence, and that he had access to weapons that he could use in furtherance of those acts, if he so chose. The evidence unquestionably establishes Hoskins's membership in a group with violent aims and his association with individuals who commit violent crimes. But it is not sufficient to support a finding that Hoskins specifically intended to enter an agreement to commit murder, or that he specifically intended to commit murder, either personally or through others." (*Ware, supra*, 14 Cal.5th at p. 174.) However, as our discussion of the facts of this case indicated, the preliminary evidence provided facts that support a reasonable inference that defendant was aware of and acted to assist Alonso in killing Mario.

Our Supreme Court's decision in *People v. Lamb* (2024) 16 Cal.5th 400 (*Lamb*) is instructive. In upholding the trial court's denial of a motion for judgment of acquittal as to a conviction for conspiracy to commit murder, the court found substantial evidence of conspiracy even in the absence of direct evidence. (*Id.* at p. 442.) The victim was a member of a gang who was found dead, with a single shot to his head, following his participation in a news program about the gang and in violation of gang rules. (*Id.* at pp. 408–409, 411.) Michael Lamb and Jacob Rump were arrested three days after the murder, following a pursuit in which Lamb used the murder weapon to fire at an officer. (*Id.* at pp. 409–410.) The prosecutor's theory was that another conspirator drove the

18.

victim to an alley where Lamb, assisted by Rump, shot the victim in retaliation for the victim's participation in the news program. (*Id.* at p. 408.)

One witness testified that Lamb called her apartment to speak to Tanya Hinson about something he characterized as very important. (*Lamb, supra*, 16 Cal.5th at p. 408.) She later saw Hinson, Lamb, and Rump in her living room, and they left at her request. (*Ibid.*) A few minutes later, she heard a single gunshot. Ten minutes after that, she saw a vehicle with three men with shaved heads[8] driving through the alley. (*Lamb*, at p. 408.) The victim was found there with a single gunshot wound to the back of his head. (*Id.* at pp. 408–409.)

Our Supreme Court found "substantial circumstantial evidence of a conspiracy to murder." (*Lamb, supra*, 16 Cal.5th at p. 443.) "That [they] committed the murder together is probative of an agreement to have done so" "when there is indicia of organization and forethought." (*Ibid.*) Although there was no direct evidence that Lamb and Rump discussed killing the victim in advance, there was evidence that they were alone together shortly before the killing, during which a discussion and agreement could have taken place. Lamb wanted to discuss something important with Hinson on the day of the murder, met with Rump and Hinson later that night, and left the apartment together just before the murder and near where it occurred. (*Ibid.*) These circumstances were sufficient to demonstrate that Lamb and Rump came to a mutual understanding to murder the victim, and their flight demonstrated a consciousness of guilt. (*Ibid.*) The court found that killing the victim with a single gunshot to the back of the head and the lack of defensive wounds indicated planning, an intent to kill, and a surprise attack, which was consistent with an agreement. (*Ibid.*)

---

**8** Trial testimony established that Lamb's head was shaven at the time of his arrest. (*Lamb, supra*, 16 Cal.5th at p. 409.)

Additionally, the relationship of Lamb, Rump, Hinson, and the victim provided the insight into their common understandings, motivations, and the bases for their agreement, such as gang members would know that the victim's cooperation with the news program would be met with severe consequences, committing a violent crime would increase that gang member's status, a gang member would be expected to be accompanied by other gang members for backup, and Lamb and Rump had a close relationship. (*Lamb, supra*, 16 Cal.5th at pp. 443–444.) "Along with evidence of Lamb and Rump's conduct, the 'relationship, interests, and activities of the alleged conspirators' here provides circumstantial evidence from which a conspiracy may be inferred. [Citation.] Contrary to Lamb's assertion, the absence of evidence that [the gang leader] ordered [the victim] to be killed does not render insubstantial this other evidence supporting the conspiracy to commit murder conviction." (*Id.* at p. 444.)

Therefore, we find the evidence at the preliminary hearing was sufficient to hold defendant to answer to the charge of conspiracy to commit murder.

## II.     *Sufficient evidence presented at the preliminary hearing established that defendant aided and abetted murder.*

### A.     Standard of Review and Applicable Law

" 'When the defendant challenges the district attorney's election to include charges for which defendant was not held to answer at the preliminary hearing, "[t]he character of judicial review … depends on whether the magistrate has exercised his power to render findings of fact." ' " (*Scully, supra*, 11 Cal.5th at pp. 581–582.) " ' "A dismissal unsupported by findings therefore receives the independent scrutiny appropriate for review of questions of law." ' " (*Id.* at p. 582.) Therefore, where the magistrate simply concludes that the People did not put forth sufficient evidence to support the charges, as happened here, we independently determine the sufficiency of the record at the preliminary hearing to support the charges. (*Ibid.*)

We set forth the applicable standard of review for challenges to the sufficiency of preliminary hearing evidence to hold a defendant to answer in part I.A. of the Discussion, *ante*. "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) Under direct aiding and abetting principles, an accomplice is guilty of murder if the accomplice aids the commission of murder with " ' "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends." ' " (*People v. Curiel* (2023) 15 Cal.5th 433, 463.) "[A]n aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Reyes*, at p. 990.) " '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.' " (*Id.* at pp. 990–991.) In the context of implied malice, the direct aider and abettor's actus reus includes whatever words or conduct aid the commission of the perpetrator's life-endangering act. (*Id.* at p. 991.) " 'The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Ibid.*)

## B.    Analysis

Having found that the preliminary hearing evidence was sufficient to establish a suspicion that defendant was aware Alonso intended to kill Mario, we conclude that the defendant's acts of communicating and picking up the other gang members to assist Alonso, driving Alonso to the location of the intended killing, and waiting nearby to

21.

transport Alonso and the others from the location of the killing demonstrate defendant's intent to aid and abet Alonso.

Therefore, we conclude that the evidence at the preliminary hearing was sufficient to establish a reasonable suspicion that Mario was murdered and defendant intended to aid and abet Mario's murder.

**DISPOSITION**

The trial court's order dismissing the information is reversed. The trial court is directed to vacate its February 11, 2025 order granting the section 995 motion to set aside the information, and to thereafter issue a new and different order denying the motion.

HILL, P. J.

WE CONCUR:

DETJEN, J.

GUERRA, J. *

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22.